UNITED STATES, Appellee,

v.

Michael B. LONDON, Defendant,
Appellant.

No. 93–1898.

United States Court of Appeals,
First Circuit.

Heard May 4, 1995.

Decided Sept. 18, 1995.

Order Denying Rehearing and
Suggestion for Rehearing En Banc
Oct. 20, 1995.

Henry D. Katz, Chelsea, MA, for appellant.

Nina S. Goodman, Attorney, with whom, David S. Kris, Attorney, Department of Justice, Criminal Division, Appellate Section, Washington, DC, Donald K. Stern, United

States Attorney, Dina M. Chaitowitz, Assistant United States Attorney, and Michael Kendall, Assistant United States Attorney, Boston, MA, were on brief for appellee.

Before CYR, Circuit Judge, COFFIN, Senior Circuit Judge, and BOWNES, Senior Circuit Judge.

BOWNES, Senior Circuit Judge.

After a trial that spanned the better part of two months, a jury convicted defendant-appellant Michael B. London of conspiring to conduct and actually conducting the affairs of an enterprise through a pattern of racketeering activity ("RICO conspiracy" and "RICO substantive"), money laundering, failing to file currency transaction reports ("CTRs"), conspiring to commit extortion, and aiding and abetting extortion. Subsequent to the jury verdict, London also pleaded guilty to tax evasion. For his crimes, London was sentenced to 188 months' imprisonment and fined $500,000. In addition, he agreed to forfeit $865,000.

In this appeal, London challenges his convictions, arguing that the district court erred: (1) in failing to suppress certain evidence relevant to his counts of conviction; (2) in instructing the jury on the law regarding failure to file CTRs; and (3) in failing to grant his motion for a judgment of acquittal on the money laundering and RICO counts. After carefully considering the parties' arguments, we affirm.

## I.

### A. Factual Background

London operated Heller's Cafe ("Heller's"), a bar in Chelsea, Massachusetts. He also ran a check-cashing service, known as M & L Associates ("M & L"), out of a small enclosed area in the bar. M & L charged its customers a 1% or 1.5% commission on each check cashed. Both Heller's and M & L had at least one employee other than London.

The evidence at trial demonstrated that bookmakers tended to frequent Heller's and to use M & L as a check-cashing service. Sometimes, M & L cashed bookmaker checks that banks would not accept. For example, some checks were neither made out by nor payable to the bookmakers (or bookmakers' agents) who were cashing them. Others were made out either to fictitious names or to real persons or entities who were not to receive the funds. London neither asked about the names on the checks he cashed nor required that the checks be endorsed. And before December 17, 1986—the day on which federal agents executed a search warrant at Heller's, *see infra* at 1231—London never filed a CTR notifying the Internal Revenue Service ("IRS") of his many currency transactions involving more than $10,000. *See* 31 U.S.C. § 5313(a) (requiring financial institutions to report currency transactions in the manner prescribed by the Secretary of the Treasury) *and* 31 C.F.R. § 103.11(i)(3) (check-casher is a financial institution) *and* 31 C.F.R. § 103.22(a)(1) (financial institutions must report all currency transactions involving more than $10,000 to the IRS).

London's operating procedures were a boon to his bookmaker customers. Not only did London provide these customers with an immediate and untraceable source of cash to pay their various expenses (including gamblers' winnings), he enabled them to accept checks from their own customers. This, in turn, increased business volume, for the ability to pay gambling debts by check encouraged gamblers to make larger and more frequent bets. It also made it easier for out-of-state gamblers to do business with local bookmakers, and possible for some gamblers to pay debts with company funds (and thereby gamble with money on which they paid no taxes).

London's promotion of bookmaking often took a more active form. In 1986, London operated a bookmaking operation with one Kenny Miller. He also helped run one Dominic Isabella's bookmaking operation while Isabella was ill. Finally, London acted as a "pay and collect" man for many of his bookmaker customers, making payments to winning gamblers and collecting payments from losers.

London also assisted Vincent Ferrara, the leader of an organized crime group, in collecting "rent" (i.e., protection money) from bookmakers. London identified certain of

his bookmaker customers to Ferrara, telling him "anybody I get you get." London then summoned the bookmakers to Heller's to meet with Ferrara, who demanded that they pay him anywhere from $500 to $1000 (or more) per month for "protection" and help in debt collection. London collected rent payments and, at least once, passed along a request for debt collection assistance from a bookmaker who had been induced to accept Ferrara's protection.

As stated above, London never filed a CTR with the IRS prior to the execution of the search warrant on December 17, 1986. From December 18, 1986, through December 31, 1988, however, he filed 211 CTR's on behalf of M & L. Although London had instructed his customers to make certain that each check was for less than $10,000, London did cash individual checks that were in amounts greater than $10,000. When he cashed a group of checks for the same customer, London would often deposit the checks on different days or in different bank accounts. There was testimonial evidence tending to indicate that London was aware of the statutory and regulatory reporting requirements during the period in which he failed to file any CTRs with the IRS.

## B. Procedural History

On October 28, 1986, in response to an application and affidavit made pursuant to an on-going investigation of London, his businesses, and his associates, the district court issued two orders authorizing the government to conduct electronic surveillance at Heller's. The first order authorized, for a thirty-day period, the interception of oral communications in and adjacent to the enclosed area in which M & L operated; the second authorized, also for a thirty-day period, the recording of wire communications made from two telephones located behind the bar. In order to minimize the interception of otherwise non-interceptable communications, the court's orders limited surveillance to times when named targets of the investigation were on Heller's premises. On December 3, 1986, the court extended each of the orders for an additional thirty days. Evi-

dence derived from these interceptions was introduced against London at trial.

On December 17, 1986, federal agents applied to a magistrate judge for a warrant authorizing them to search Heller's for evidence of unlawful gambling, loansharking, distribution of narcotics, money laundering, and failure to file CTRs. The magistrate judge issued the warrant, authorizing the agents to search "Heller's Cafe, which occupies the first floor and basement of 110 Chestnut Street" and to seize "books and records, ledgers, correspondence, notes, slips, checks and any other documents, including bank records, which reflect unlawful gambling, loansharking, narcotics distribution, and failure to file currency transaction reports; and U.S. currency which constitutes proceeds of these offenses." The agents executed the warrant later that day, and seized, *inter alia,* almost all of the records found in the enclosed area from which M & L operated. Evidence seized in the course of this search was introduced against London at trial.

On April 11, 1990, a federal grand jury returned a two-count indictment charging London with income tax evasion. On May 10, 1990, the grand jury returned a fifty-one count superseding indictment charging London with, *inter alia,* the counts of conviction: one count of RICO conspiracy, 18 U.S.C. § 1962(d); one count of RICO substantive, 18 U.S.C. § 1962(c); twelve counts of money laundering, 18 U.S.C. § 1956(a)(1); twelve counts of failing to file CTRs, 31 U.S.C. §§ 5313(a) and 5322(b); one count of conspiring to commit extortion, 18 U.S.C. § 1951; two counts of aiding and abetting extortion, 18 U.S.C. §§ 2 and 1951; and one count of tax evasion for tax year 1985, 26 U.S.C. § 7201. On September 5, 1991, the grand jury returned a second superseding indictment which charged no new offenses but brought the indictment within the purview of the United States Sentencing Guidelines by extending the period of the alleged RICO conspiracy to after November 1987.

On August 17, 1992, the district court orally denied London's previously-filed motion to suppress the evidence seized during the December 17, 1986, search of Heller's. On Au-

gust 18, 1992, the court issued a written memorandum and order denying London's previously-filed motion to suppress the fruits of the electronic surveillance.

Trial commenced on January 4, 1993, and concluded on February 19, 1993, when the jury returned guilty verdicts on the counts of conviction listed above. The other counts contained in the second superseding indictment either had been dismissed by the government prior to trial or were dismissed by the district court at trial. In addition, the jury acquitted London on one money laundering count. On June 30, 1993, the district court sentenced London. This appeal followed.

## II.

As set forth above, London's appellate arguments fall into three main groups. First, London takes issue with the district court's denial of his suppression motions. Second, London challenges the jury instructions given in connection with the counts of the second superseding indictment charging him with failing to file CTRs. Third, London makes sundry arguments that there was insufficient evidence to support his money laundering and RICO convictions. We discuss each of London's arguments in turn.

### A. Denial of the Motion to Suppress the Fruits of the Electronic Surveillance

London contends that the district court erred in denying his motion to suppress the fruits of the electronic surveillance conducted at Heller's in 1986. He claims that the aforementioned surveillance ran afoul of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.* ("Title III")—the federal statute that governs electronic surveillance—in five ways: (1) no Department of Justice official designated in 18 U.S.C. § 2516(1) had authorized the local United States Attorney to apply for the initial interception orders; (2) the orders improperly allowed the government to monitor conversations relating to money laundering, which was not an offense for which interception could be ordered, *see* 18 U.S.C. § 2516(1)(a)–(*o*), on the date the interception orders issued; (3) the government intercept-

ed and disclosed extortion-related conversations—conversations pertaining to the paying of "rent" to Ferrara—beyond the scope of the court's orders; (4) the court ordered and the government employed inadequate minimization procedures under 18 U.S.C. § 2518(5); and (5) the government's application misled the district court as to the necessity for conducting electronic surveillance, in violation of 18 U.S.C. § 2518(1)(c). Because we are not persuaded by any of these arguments, we affirm the district court's denial of the suppression motion.

### 1. Internal Authorization under 18 U.S.C. § 2516(1)

■ Title III compels local prosecutors to obtain internal authorization from a statutorily-designated Justice Department official prior to applying for a judicial interception order. 18 U.S.C. § 2516(1). Failure to comply with this "central" provision of Title III requires suppression of the fruits of the unauthorized interception. *United States v. Giordano,* 416 U.S. 505, 524–29, 94 S.Ct. 1820, 1831, 40 L.Ed.2d 341 (1974). As noted, London contends that the initial interception application was not authorized by a statutorily-designated Justice Department official. London is mistaken.

■ The government attached to its initial interception application the first page of a two-page authorization memorandum prepared on October 24, 1986, by William F. Weld, then the Justice Department's Assistant Attorney General for the Criminal Division, and the second page of the cover letter which accompanied the Weld memorandum, which was signed for Weld by Frederick D. Hess, the Justice Department's Director of the Office of Enforcement Operations of the Criminal Division. It is undisputed that Weld was a statutorily-designated official and Hess was not. In rejecting London's suppression motion, the district court found that Weld had authorized the interception application (as the application had stated) and that "the government committed a collating error by providing page one of the Weld approval letter followed by page two of a separate letter written by Hess to Robert S. Mueller,

III, Acting United States Attorney for the District of Massachusetts."

London does not dispute the accuracy of the district court's "collating error" finding; nor does he disagree that the finding would validate the application if the district court was empowered to look beyond the face of the application in deciding whether there had been proper authorization. Relying on *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), and *United States v. O'Malley*, 764 F.2d 38 (1st Cir. 1985), he instead argues that the finding cannot save the government's application because the district court was limited to a "facial analysis" of the authorization in determining whether a statutorily-designated official had approved the interception application. Even if his construction of *Chavez* and *O'Malley* is correct (an issue on which we express significant doubt but no formal opinion), the facial analysis London advocates reveals that Weld—and not Hess—authorized the interception application.

London's argument hinges entirely on the fact that Hess signed on behalf of Weld the second page of the miscollated authorizing papers that were attached to the interception application. What it neglects to take into account, however, is that *Weld* signed the first page, which states at the top that it is a memorandum from "William F. Weld, Assistant Attorney General, Criminal Division." Furthermore, that same first page clearly indicates that the Assistant Attorney General in charge of the Criminal Division (i.e., Weld) authorized the application:

> By virtue of the authority vested in him by Section 2516 of Title 18, United States Code, the Attorney General of the United States has by Order Number 1088–85, dated March 28, 1985, specially designated the Assistant Attorney General in charge of the Criminal Division to authorize applications for court orders authorizing the interception of wire or oral communication. As the duly appointed Assistant Attorney General in charge of the Criminal Division, this power is exercisable by me. WHEREFORE, acting under this delegated power, I hereby authorize the above-described [London] application to be made

by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

Finally, nothing in the text of either page of the papers presented to the district court even remotely suggests that Hess, and not Weld, authorized the application.

We therefore reject London's argument that the initial interception application was not authorized by a statutorily-designated Justice Department official.

### 2. Interception of Conversations Relating to Money Laundering

■ Title III specifies the offenses for which an interception order may issue. 18 U.S.C. § 2516(1)(a)–(*o*). Money laundering in violation of 18 U.S.C. § 1956 was so specified by legislation that became effective October 27, 1986. Pub.L. 99–570, Title I, § 1365(c), Oct. 27, 1986, 100 Stat. 3207–35. As noted, London argues that the initial interception orders authorized the interception of conversations relating to money laundering prior to the date on which money laundering was added to 18 U.S.C. § 2516(1)'s list of offenses. Even if we assume *arguendo* that the initial interception orders did authorize the interception of conversations relating to money laundering in violation of 18 U.S.C. § 1956 (a position with which the government forcefully disagrees and on which we take no position), London's argument lacks a factual basis.

London claims that the district court's initial interception orders issued on October 24, 1986, three days before money laundering became a predicate offense under 18 U.S.C. § 2516(1). The record reveals, however, that the initial interception orders issued on October 28, 1986, not October 24, 1986. Thus, money laundering in violation of 18 U.S.C. § 1956 *was* an offense for which an interception order could issue at the time of the initial interception orders issued in this case.

We therefore reject London's argument that the initial interception orders authorized the interception of conversations relating to money laundering at a time when money

laundering was not a predicate offense under 18 U.S.C. § 2516(1).

### 3. Interception and Disclosure of Extortion–Related Conversations

With certain exceptions, Title III prohibits the interception and disclosure of conversations other than those relating to the offenses specified in the district court's interception order. *See generally* 18 U.S.C. §§ 2511, 2517, and 2518(4)(c). As noted, London argues that the government wrongfully intercepted and disclosed certain extortion-related conversations (i.e., conversations concerning the paying of "rent" to Ferrara) despite the fact that the district court's initial interception orders did not specify extortion in violation of 18 U.S.C. § 1951 as a target offense. London's claim of governmental overreaching in this context is without merit.

■ Unlike London's first two arguments, the instant one is not built upon a faulty factual basis; extortion in violation of 18 U.S.C. § 1951 was not a target offense listed in the government's interception applications or the district court's interception orders. This fact alone, though, does not make the interception of the "rent" conversations unlawful. Title III clearly contemplates that law enforcement officials will, in the course of intercepting conversations related to specified target offenses, intercept conversations "relating to offenses other than those specified in the order of authorization or approval." *See* 18 U.S.C. § 2517(5). For example, an intercepted conversation can relate to both a specified offense *and* to an unspecified offense. In such a situation, the interception is unlawful only when it is motivated by an illicit purpose—e.g., "subterfuge" interceptions where the government applies to intercept conversations relating to offenses specified in 18 U.S.C. § 2516(1)(a)–(o) while intending to intercept conversations relating to offenses for which interceptions are unauthorized or for which it has no probable cause to obtain an interception order. *See United States v. Angiulo*, 847 F.2d 956, 980 (1st Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988).

■ Here, the intercepted "rent" conversations clearly related to at least one offense—operating a gambling business in violation of 18 U.S.C. § 1955—specified in the initial authorization orders. The victims of the rent/extortion scheme were bookmakers involved in illegal gambling, and the intercepted conversations provided a means of identifying them. Moreover, the district court supportably found that there was no subterfuge involved in the initial interception applications. *See Angiulo*, 847 F.2d at 980 (clear-error reviewing standard applicable to finding that government's wiretap application was not subterfuge). Extortion, after all, is an enumerated offense under 18 U.S.C. § 2516, and there would have been no need for the government to engage in subterfuge unless it suspected that extortion was taking place but lacked the probable cause necessary to intercept conversations pertaining to extortion. London makes no argument along these lines, and the record does not suggest this sort of governmental deception. The government's interception of the "rent" conversations was therefore not unlawful.

■ We still must consider whether the government acted unlawfully in disclosing the rent conversations during the proceedings below. The government argues that the disclosure of such "other offense" evidence is permissible so long as the information is related to an offense listed in the initial authorization orders. *Cf. United States v. Shields*, 999 F.2d 1090, 1097 (7th Cir.1993) ("Since the government was free to release this information to a grand jury anyway under the [authorization for the offenses listed in the Title III order], it is difficult to see how the defendants were harmed when the same facts were presented in the context of different offenses."), *cert. denied,* — U.S. —, 115 S.Ct. 515, 130 L.Ed.2d 421 (1994). We need not reach the merits of this argument, however, because we conclude that the district judge who issued the initial interception orders impliedly and permissibly authorized the disclosure of the conversations at issue.

Under 18 U.S.C. § 2517(5), the government may secure a court's blessing to disclose the contents of an "other offense" interception in connection with a federal prosecu-

tion. The relevant statutory provision permits disclosure when the interception has been "authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of [Title III]. Such application shall be made as soon as practicable." *Id.* It is settled that disclosure authorization "can be implicitly obtained when a judge grants a renewal of a wiretap after being advised of the essential facts of the unspecified violation." *United States v. McKinnon,* 721 F.2d 19, 23–24 (1st Cir.1983). In other words, "the disclosure in subsequent affidavits to the issuing judge of material facts constituting or clearly relating to other offenses satisfies the Government's obligation to seek judicial authorization for the disclosure and use of evidence inadvertently intercepted." *Id.* at 24 (citations and internal quotation marks omitted).

As the district court found in denying London's suppression motion, there was implicit authorization in this case. When the government applied for extensions of the initial interception orders, its attached affidavit advised the court of interceptions containing the essential facts of the extortion violations:

> London acts as a bank and account keeper for other bookmaking and loansharking operations.... [Also] London's illegal businesses, and the illegal businesses for which London keeps the accounts, only operate with the consent and protection of certain other persons, to whom London and others pay a percentage of their income.... Further electronic surveillance is necessary, however, to identify the balance of the members of each organization and the relationship between London, these organizations, and the persons to whom 'rent' is paid, as discussed below.

The attached affidavit then detailed London's relationship with Ferrara. Thus, the court's approval of the extension application constituted both an implicit finding that the extortion-related conversations were intercepted in accordance with the provisions of Title III and permission for the subsequent disclosure of the conversations. *See McKinnon,* 721 F.2d at 23–24.

London complains that the affidavit not only failed to seek approval for subsequent interceptions of extortion-related conversations, but it also failed to alert the court that some of the intercepted conversations related to "other offense" evidence. While we certainly think it advisable that the government provide issuing courts with this type of notice, we note that it is not a *sine qua non* of implicit authorization. We presume that the court read the supporting affidavit with care, and took seriously its obligation to police the interceptions that were taking place. We require no more to infer implicit authorization. *Cf. id.* at 23 (supporting affidavits describing communications related to other offenses sufficient to ground "reasonable ... conclu[sion]" that issuing judge approved of their interception); *see also United States v. Masciarelli,* 558 F.2d 1064, 1068 (2d Cir.1977) ("[W]e presume ... that in renewing ... the tap the judge carefully scrutinized th[e] supporting papers and determined that the statute's requirements had been satisfied.") (citation and internal quotation marks omitted).

We therefore reject London's argument that the interception and disclosure of the extortion-related conversations violated Title III.

### 4. Minimization under 18 U.S.C. § 2518(5)

Title III requires the government to conduct electronic surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). Without specifying any wrongfully intercepted conversations, London asserts that there was inadequate governmental minimization during the interceptions at Heller's. Although London's argument on this issue is a bit disjointed, two alleged inadequacies emerge from his brief: (1) the court's order permitting surveillance whenever a named target was on Heller's premises (instead of a more restrictive order); and (2) the government's policy of recording all conversations carried out in Spanish unless and until a bilingual agent was available to make minimization decisions. In the circumstances of this case, we see no

error in either the court's order or the government's policy regarding communications in Spanish.

■ In assessing whether the government's minimization efforts pass muster under 18 U.S.C. § 2518(5), we make an objective assessment in light of the facts and circumstances known to the government at the relevant points in time. *See Scott v. United States,* 436 U.S. 128, 136–37, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). When making this assessment, we tend to focus on (1) the nature and complexity of the suspected crimes; (2) the thoroughness of the government's precautions to bring about minimization; and (3) the degree of judicial supervision over the surveillance process. *United States v. Uribe,* 890 F.2d 554, 557 (1st Cir.1989); *Angiulo,* 847 F.2d at 979. We also are mindful that Title III "does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott,* 436 U.S. at 140, 98 S.Ct. at 1724. This means that "[t]he government is held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required." *Uribe,* 890 F.2d at 557.

London's minimization arguments do not call into question any specified acts of the intercepting agents; instead, they implicate the thoroughness of certain of the court's and government's minimization precautions. In other words, they amount to claims that an implicit requirement allegedly imposed on the government by *Uribe* and *Angiulo*—that the government's *precautions* to bring about minimization be sufficiently "thorough" to pass muster under 18 U.S.C. § 2518(5)—has not been met in this case, and that suppression of all intercepted conversations is the appropriate remedy. Even if we assume *arguendo* that London can win total suppression without challenging the propriety of any particular interceptions, we see no merit in his arguments.

London characterizes as insufficient the court's "targeted individual must be on the premises" limitation by stating:

Perhaps, an undercover agent acting as a patron, could [have] signal[led] when a target was talking on a particular telephone or near one of the bugs and thereby minimize[d] the intrusion into the privacy of innocent persons conversing at other locations. Perhaps monitoring agents could have been directed to cease monitoring at any device when a target was not heard on that device.

He has not, however, effectively rebutted the government's colorful assertion, made both to the district court and on appeal, that "had an undercover agent remained inside the small, intimate ... Heller's Cafe to relay a signal every time a target spoke into a surveillance device, London would have identified him as quickly as Ali Baba in his cave would have spotted a spy among his chosen forty." Nor has he rebutted the government's sworn assertion that "agents were instructed to and did cease monitoring when they determined that none of the targets was a party to [a] conversation or that only personal, non-criminal activity was discussed." In our view, the former of these two assertions is sufficient to respond to London's argument that there should have been an undercover agent inside Heller's, and the latter effectively undermines any suggestion that the monitoring agents were free to listen in on the conversations of non-targeted individuals.

■ London's challenge to the government's policy regarding Spanish conversations is answered more easily: when an interpreter is not reasonably available, Title III explicitly allows full-scale recording and *post hoc* minimization of conversations carried out in foreign languages. *See* 18 U.S.C. § 2518(5) ("In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception."). Although the above-quoted statutory provision was not yet effective at the time of the interceptions here at issue (it was passed prior to the interceptions but went into effect thereafter), its existence as pending legislation renders objectively reasonable the government's policy—which

tracked the legislation—regarding intercepted conversations carried out in Spanish.

This was a complex case involving a sophisticated defendant, complicated financial dealings, and links to organized crime. In view of this, we cannot say that either the complained-of minimization precautions or the other minimization precautions ordered by the court and taken by the government were so lacking in thoroughness that they violated Title III.

We therefore reject London's minimization arguments.

### 5. Necessity under 18 U.S.C. § 2518(1)(c)

Title III dictates that the government's interception application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). We have interpreted this "necessity" provision to mean that the statement should demonstrate that the government has made "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *United States v. Hoffman,* 832 F.2d 1299, 1306–07 (1st Cir.1987). London argues that the government's application misled the court as to the need for electronic surveillance by failing to mention that the government had not engaged in the following investigative techniques: (1) subpoenaing London's bank records; (2) utilizing two confidential informants—Francis McIntyre and John DeMarco—allegedly available to it; and (3) placing undercover agents inside of Heller's. London's claims are not convincing.

■ The first and third of London's claims are difficult to fathom, as the affidavit attached to the interception application indicated both that the government *did* review London's bank records (during an unrelated investigation) prior to applying for the interception orders and that undercover infiltration was not available because "surveillance observations have disclosed a high degree of consciousness by London and others to the possibility of law enforcement scrutiny" and because London "requires two known references prior to engaging in illegal transactions with a person." Other than making the general and unpersuasive argument that "visual surveillance by undercover agents" *was* possible because Heller's "was fully accessible to the public eye" and had no "back rooms," London has not taken issue with the affidavit statements. *See supra* at 1236 (noting, in a different context, London's failure to rebut the government's explanation why undercover agents could not insinuate themselves into Heller's). And he certainly has not explained how the affidavit statements themselves may have been misleading. We consequently see no factual basis for London's first and third claims.

■ As to the claim that the government misleadingly failed to disclose the availability of McIntyre and DeMarco as informants, London has not even attempted to rebut, by pointing to contrary evidence, the district court's findings that, at the time of the initial application, the government reasonably believed (1) that McIntyre would not testify against London; and (2) that DeMarco's "investigatory potential ... [was] immaterial to the investigation at Heller's." In light of this, we cannot say that these findings are clearly erroneous. *See United States v. Schiavo,* 29 F.3d 6, 8 (1st Cir.1994) (findings of fact made after suppression hearing reviewed for clear error). And the findings plainly undermine London's contention that the failure to disclose McIntyre's and De-Marco's alleged investigatory potential violated 18 U.S.C. § 2815(1)(c).

We therefore reject London's argument that the government misled the district court as to necessity when applying for the initial interception orders.

### B. Denial of the Motion to Suppress the Evidence Seized During the December 17, 1986, Search of Heller's

■ London argues that the district court erred in denying his motion to suppress the evidence seized pursuant to the December 17, 1986, search of Heller's—i.e., almost all of M & L's business records, some of

Heller's business records, and a significant amount of cash on the premises of Heller's that day. He characterizes as unconstitutionally overbroad the warrant's description of items to be seized: "books and records, ledgers, correspondence, notes, slips, checks and any other documents, including bank records, which reflect unlawful gambling, loansharking, narcotics distribution, and failure to file currency transaction reports; and U.S. currency which constitutes proceeds of these offenses." He also argues that the officials who executed the search could not have held an objectively reasonable belief that the overbroad language in the search warrant was constitutional. Because we disagree with the latter of London's two arguments, we repudiate his assignment of error without assessing the constitutionality of the warrant.

It is well settled that "suppression is appropriate only if the officers were dishonest or reckless in preparing [the warrant] affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon,* 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984). Here, London has not challenged the preparation of the warrant affidavit, identified any documents which allegedly were seized without probable cause, or argued that the executing agents exceeded the warrant's scope. Nor has he asserted that there was an absence of probable cause for *some sort* of warrant to have issued. Assuming *arguendo* that London might still be entitled to suppression without having made any of these arguments, our inquiry reduces to whether the description of items to be seized was so facially defective that an objectively reasonable officer would have known of the warrant's unconstitutionality. We hardly think so.

Even if the description of items to be seized might have been more particular, it was not patently overbroad when viewed in context. London operated a complex criminal enterprise where he mingled "innocent" documents with apparently-innocent documents which, in fact, memorialized illegal transactions. London also intermingled his legitimately-obtained and innocently-obtained

currency. It therefore would have been difficult for the magistrate judge to be more limiting in phrasing the warrant's language, and for the executing officers to have been more discerning in determining what to seize. In similar circumstances, we have stated:

> We must ... recognize that the inherent difficulty in segregating "good" from "bad" records, and consequently in drawing up an adequately limited warrant, makes it difficult for even a reasonably well-trained officer, who is not expected to be a legal technician and is entitled to rely on the greater sophistication of the magistrate— to know precisely where to draw the line.

*United States v. Diaz,* 841 F.2d 1, 6 (1st Cir.1988) (overturning a suppression order based on an overbroad search warrant). Like *Diaz,* the question whether the description of items to be seized was unconstitutionally overbroad was, at best, close, and the executing officers were objectively reasonable in deferring to the magistrate judge's trained judgment.

We therefore reject London's argument that all the evidence seized during the December 17, 1986, search of Heller's should have been suppressed.

## C. Jury Instructions Regarding London's Failure to File CTRs

London argues that we should vacate his convictions for failing to file CTRs because the district court erroneously informed the jury that London could be convicted of the "willful" violation proscribed by 31 U.S.C. § 5322(b) if he had merely a reckless disregard of his legal duties regarding the filing of CTRs. The government takes the position that the court's instructions were incorrect in light of *Ratzlaf v. United States,* — U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (knowledge of the illegality of one's actions is necessary to sustain a conviction under 31 U.S.C. § 5322) (illegal structuring case), an opinion issued after London's trial, but points to London's failure to object and contends that the instructions do not constitute plain error under Fed.R.Crim.P. 52(b) (defects not brought to the attention of the trial court reviewed for plain error). London counters

that his failure to object cannot be considered a waiver because the instructions were in complete accord with an *en banc* decision of this court—*United States v. Aversa*, 984 F.2d 493 (1st Cir.1993) (*en banc*) (illegal structuring case), *vacated*, —— U.S. ——, 114 S.Ct. 873, 127 L.Ed.2d 70 (1994)—that had been handed down a mere one month prior to the jury instructions in this case.

Before addressing the issue of waiver, we must inquire whether the present law of the circuit precludes a determination of error even if London has not waived objection to the instructions. In a recent decision, another panel of this court expressed doubt as to whether *Ratzlaf* overruled *Aversa*'s alternative reckless disregard standard. *See United States v. Saccoccia*, 63 F.3d 1, 14 (1st Cir. 1995). But this comment was only dictum. It was not necessary to the *Saccoccia* panel's finding that the instruction challenged in that case was not *plainly* erroneous. *Id.* at 14 (noting the defendant's failure to object). Nor was it implicitly or explicitly relied upon when the panel held the evidence sufficient for the jury to have found that the defendants "knew that their own activities were unlawful." *Id.* at 16. The reckless disregard standard therefore played no role in the *Saccoccia* court's *holding*. We therefore feel that the question whether *Ratzlaf* has impliedly left untouched or overruled *Aversa* remains to be decided—if the issue has not been waived.

 Addressing the waiver issue we conclude that London's failure to object was excusable under the circumstances of this case. The government argues that, despite the recency of the *Aversa* decision and the overall state of the law at the time of his trial, London has waived any argument that the aforementioned instructions were erroneous. While acknowledging that waiver should not "be inferred, and no plain error requirement imposed, where [a] Supreme Court[ ] ruling comes out of the blue and could not have been anticipated," *see United States v. Weiner*, 3 F.3d 17, 24 n. 5 (1st Cir.1993), the government contends that the split between this and the other ten circuits as to the meaning of willfulness under 31 U.S.C. § 5322 "made it likely that the issue would be resolved by the Supreme Court" and made it incumbent upon London to lodge an objection. In so doing, the government relies on our recent decision in *United States v. Marder*, 48 F.3d 564 (1st Cir.) (illegal structuring case), *cert. denied*, —— U.S. ——, 115 S.Ct. 1441, 131 L.Ed.2d 320 (1995), where we indicated that defendant Marder's failure to object to a § 5322 willfulness instruction given prior to *Ratzlaf* was inexcusable. *Id.* at 572 n. 5. *Marder* is not on-point, and the government's argument is not persuasive.

As an initial matter, Marder's trial occurred prior to our decision in *Aversa*. Thus, the compelling scenario presented here—instructions mirroring exactly the holding of a recent *en banc* opinion of the controlling circuit court—did not exist in that case. More importantly, however, Marder's trial judge, without objection, erroneously instructed the jury in accordance with the law in the other circuits (i.e., that knowledge of the reporting requirements was all that was needed to establish willfulness under 31 U.S.C. § 5322) despite (1) the existence of authority in *this* circuit indicating that knowledge of illegality was necessary to establish willfulness under § 5322, *see Marder*, 48 F.3d at 572 n. 5 (citing *U.S. v. Bank of New England*, 821 F.2d 844, 854 (1st Cir.), *cert. denied* 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987)); and (2) our recent withdrawal of an on-point panel opinion and decision to hear the *Aversa* case *en banc, see id.* In view of these circumstances, which should have put Marder on notice that § 5322's willfulness criterion for illegal structuring might imply something more than knowledge of the reporting requirements, we deemed inexcusable Marder's failure to object to the defective instructions. *Id.* We therefore reviewed the instructions only for plain error. *Id.*

The situation presented in this case is in stark contrast to that in *Marder*. As we have explained, the law of this circuit was settled by nothing less than a newly-minted *en banc* opinion at the time the trial judge instructed London's jury. This fact alone goes a long way, if not the whole way, towards excusing London's failure to object.

Moreover, at this same time, all eleven circuits had at least implicitly indicated that a reckless disregard of legal duties regarding the filing of CTRs was sufficient to establish willfulness under 31 U.S.C. § 5322. *See Ratzlaf,* —— U.S. at —— n. 3, 114 S.Ct. at 665 n. 3 (Blackmun, J., dissenting) (pointing out the near-uniformity in the circuits that mere knowledge of the reporting requirements is enough to establish willfulness under § 5322, and stating "[t]he only Court of Appeals to adopt a contrary interpretation is the First Circuit, and even that court allows reckless disregard of one's legal duty to support a conviction for structuring") (citation and internal quotation marks omitted). Consequently, if we conclude that *Ratzlaf* implicitly held that a reckless disregard of one's legal duties under the reporting requirements is not enough to establish willfulness under § 5322, such a holding would be precisely the type of unanticipated, "out of the blue" Supreme Court ruling we alluded to in *Weiner.* We therefore must proceed to our interpretation of the scope of *Ratzlaf.*

 In *Ratzlaf* the trial court instructed the jury that it could convict even if it found the defendant had no knowledge of the antistructuring statute but acted with the purpose of circumventing a bank's reporting obligation. The Court stated:

> We hold that the "willfulness" requirement mandates something more. To establish that a defendant "willfully violated" the antistructuring law, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.

—— U.S. at ——, 114 S.Ct. at 656.

In *Aversa,* an en banc decision, we held that "reckless disregard" of the law satisfied the willfulness requirements of the structuring statute. 984 F.2d at 502. In light of *Ratzlaf, Aversa* remains law in this circuit only if reckless disregard falls within *Ratzlaf's* concept of "knowledge."

As we survey post-*Ratzlaf* law in the circuits, we find one circuit which has adopted the standard of "actual knowledge." *United States v. Retos,* 25 F.3d 1220, 1230 (3d Cir. 1994). Other circuits—none of whom, pre-*Ratzlaf,* had required any knowledge of structuring laws—have simply echoed *Rat-*

*zlaf's* requirement of "knowledge." We are not helped by these decisions, for we face a different problem: having previously articulated a standard which posed what we deemed essentially an equivalent to "knowledge," and which, while recognized in *Ratzlaf,* was neither embraced nor disavowed, shall we proclaim it now alive or dead?

In short, when should we apply the literal meaning of a word used in a Supreme Court decision to a generic circumstance that was not in controversy before the Court? We begin with the general advice of Chief Justice Marshall in *Cohens v. Virginia,* 6 Wheaton (19 U.S.) 264, 399–400, 5 L.Ed. 257 (1821):

> It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.

An application of this maxim, relevant to the instant case, occurred in *Armour & Co. v. Wantock,* 323 U.S. 126, 132–34, 65 S.Ct. 165, 168–69, 89 L.Ed. 118 (1944), where, notwithstanding a definition of "work" in a prior Fair Labor Standards Act case as *"physical or mental exertion ...* controlled or required by the employer," the Court, through Justice Jackson, held that a company's private firefighters' idle or recreational time on duty constituted working time. Justice Jackson explained:

> [W]ords of our opinions are to be read in the light of the facts of the case under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court. General expressions transposed to other facts are often misleading.

*Id.* at 133, 65 S.Ct. at 168; *see also Reiter v. Sonotone Corp.,* 442 U.S. 330, 341, 99 S.Ct. 2326, 2332, 60 L.Ed.2d 931 (1979) (refusal to limit "business or property," as used in § 4 of Clayton Act, to "commercial interests or enterprises," though so defined in prior Court opinion).

These and other such cases reflect the Court's acknowledgement that "[p]rudence also dictates awaiting a case in which the issue was fully litigated below, so that we will have the benefit of developed arguments on both sides and lower court opinions squarely addressing the question." *Yee v. Escondido*, 503 U.S. 519, 538, 112 S.Ct. 1522, 1534, 118 L.Ed.2d 153 (1992). Our position naturally follows: "[W]e do not normally take Supreme Court opinions to contain holdings on matters the Court did not discuss and which, presumably, the parties did not argue." *Sweeney v. Westvaco Co.*, 926 F.2d 29, 40 (1st Cir.1991) (Breyer, C.J.) (citing *Cousins v. Secretary of the U.S. Dep't of Transp.*, 880 F.2d 603, 608 (1st Cir.1989) (en banc)).

We therefore adopt a restrained role. While we might, if writing on a clean slate, accept the narrowest interpretation of "knowledge," we will not easily conclude that the Court has rejected our prior decision by ambiguous inference or opaque implication. We would require a clear signal.

We now look for signals. The case for "actual knowledge" is the word itself—expressing direct acquaintance with a fact. This has the virtue of simplicity in formulating instructions to a jury. We note, too, the fact that the prosecution in our case conceded error, but this does not relieve us of our obligation to make a de novo decision. We do take cognizance that in *Ratzlaf,* the Court's references to *Aversa* were on points other than the equation of reckless disregard and knowledge-willfulness. And we also take note of the majority's failure to respond to the dissent's charge that the Court's decision repealed the "reckless disregard" standard of *Aversa.*

Looking for contrary indications, we note first, that the referent used most often by the Court was "knowledge." "Actual knowledge" was used by the majority only once, in a parenthetical reference to a 1980 Fifth Circuit case. —— U.S. at ——, 114 S.Ct. at 660 (citing *United States v. Warren,* 612 F.2d 887 (5th Cir.1980)). On the other hand, *Ratzlaf* cites to a number of other cases requiring less than actual knowledge. *See, e.g., id.* (citing cases demonstrating the use of reasonable inferences to find knowledge).

Moreover, we find a generally favorable reference to *Aversa* as the only case opposed to a no-knowledge requirement—and, while a footnote quoted our "reckless disregard" standard along with "knowledge," there was no adverse comment or caveat. *See id.* We do not ascribe to the majority's failure to take up the gauntlet on the dissent's thrust on *Aversa* as deliberate decision making.

But beyond comments in the Court's opinion, we are mindful of the wider scope given definitions of "knowledge" in cases and statutes. For example, the cases applying 18 U.S.C. § 656 (bank officer who "willfully misapplies" bank funds) have generally held reckless disregard to establish the requisite intent to defraud.[1] These holdings come close to equating, if not precisely doing so, knowledge and reckless disregard. We can make the same comment about the Supreme Court precedents equating the two concepts in various federal statutes. *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988) ("willfulness" under Fair Labor Standards Act means defendant "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute"); *Trans World Airlines v. Thurston,* 469 U.S. 111, 126, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985) ("willfulness" under Age Discrimination in Employment Act; same definition applied); *United States v. Murdock,* 290 U.S. 389, 395, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933) ("willfulness" under the Revenue Acts of 1926 and 1928, which prohibited a "willful" failure to pay a particular tax, included "careless disregard [for] whether or not one has a right so to act.")

■ In the context of the False Statements Act, 18 U.S.C. § 1001, a false statement is made knowingly if defendant demon-

---

**1.** We have so held in *United States v. Cyr,* 712 F.2d 729, 732 (1st Cir.1983), and in *United States v. Fusaro,* 708 F.2d 17, 21 (1st Cir.1983). Other circuits equate intent to injure the bank with reckless disregard of the bank's interest. *See,* *e.g., United States v. Hoffman,* 918 F.2d 44, 46 (6th Cir.1990); *United States v. Hansen,* 701 F.2d 1215, 1218 (7th Cir.1983); *United States v. Thomas,* 610 F.2d 1166, 1174 (3d Cir.1979).

strated a reckless disregard of the truth, with a conscious purpose to avoid learning the truth. *United States v. White,* 765 F.2d 1469, 1482 (11th Cir.1985); *United States v. Evans,* 559 F.2d 244, 246 (5th Cir.1977). A statutory equating of knowledge and reckless disregard is found in the definitions contained in the False Claims Act, 31 U.S.C. § 3729, which prohibits "knowingly" presenting a false or fraudulent claim to the United States Government. The definitions of "knowing" and "knowingly" apply to a person who, with respect to information, "acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(3).

There are also state cases involving fraud actions where knowledge of falsity is equated with "utter disregard and recklessness." *Singh v. Singh,* 81 Ohio App.3d 376, 611 N.E.2d 347, 350 (1992); *see also James v. Goldberg,* 256 Md. 520, 261 A.2d 753, 758 (1970) ("reckless indifference" can impute knowledge).

Beyond these instances of the elastic boundaries of "knowledge," we are sensible of the practical problems of drawing too fine a line. We have accepted the fact that a jury "could infer knowledge if a defendant consciously avoided learning about the reporting requirements." *United States v. Bank of New England, N.A.,* 821 F.2d 844, 855 (1st Cir.1987) *also cited with approval in Ratzlaf,* —— U.S. at —— n. 19, 114 S.Ct. at 663 n. 19. But reckless disregard also, as the instructions in this case stated, "involves the conscious disregard of a substantial risk." To this the court below added that the jury "may consider the frequency with which the defendant was involved in transactions which might be reportable...." When we carefully scrutinize these instructions and note that not merely the concept of recklessness is involved, but reckless disregard, we must acknowledge that the instructions require some kind of an awareness of law which is not casually or negligently but recklessly disregarded.

So, while we sympathize with those who would interpret *Ratzlaf* as requiring actual knowledge, we do not see such a clear signal as would cause us to pronounce the demise of *Aversa.* We hold that the district court's instruction was a correct application of *Aversa,* and not error under *Ratzlaf.* We, therefore, affirm London's convictions for failing to file CTRs.

### D. Sufficiency of the Evidence as to the Money Laundering and RICO Counts

London asserts that there was insufficient evidence to support his money laundering and RICO convictions. His sufficiency arguments are threefold: (1) there was insufficient evidence that he laundered money with the intent to promote illegal gambling; (2) there was insufficient evidence that the enterprise alleged in the indictment was cognizable under RICO; and (3) there was insufficient evidence of a nexus between the RICO enterprise and the racketeering acts involving extortion and the collection of illegal debts. Our review of the record persuades us that a rational jury drawing reasonable inferences could have made the challenged findings beyond a reasonable doubt. *See, e.g., United States v. Tuesta–Toro,* 29 F.3d 771, 776 (1st Cir.1994) (setting forth standard of review for sufficiency challenges), *cert. denied,* —— U.S. ——, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995).

### 1. Money Laundering

The money laundering statute under which London was convicted subjects to criminal sanctions "[w]ho[m]ever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... *with the intent to promote the carrying on of* [*the* ] *specified unlawful activity.*" 18 U.S.C. § 1956(a)(1)(A)(i) (emphasis added). Seizing upon the highlighted language, London contends that there was insufficient evidence that he conducted his check-cashing business with an intent to promote the unspecified unlawful activity at issue—i.e., illegal gambling. We disagree.

There was overwhelming evidence that London failed to file CTRs prior to the De-

cember 17, 1986, execution of the search warrant at Heller's, and that London was aware of the reporting requirements during the period in which he failed to file CTRs. There also was evidence that London's unorthodox operating procedures benefitted his bookmaker customers. Finally, there was evidence that London made money with every check he cashed. Thus, there was evidence that London knowingly operated his business in an unorthodox manner that benefitted both his bookmaker customers and (derivatively) himself. In our view, this evidence of mutual interest is more than sufficient to sustain an inference that London operated his check-cashing business with the intent to promote the illegal gambling businesses operated by certain of his customers.

We therefore reject London's argument that there was insufficient evidence to support his money laundering convictions.

### 2. The Enterprise

The RICO statute prohibits one "employed by or associated with" a statutorily-defined "enterprise" from conducting the enterprise's affairs "through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). The enterprise alleged in the indictment was an association between London's Cafe, Inc., d/b/a Heller's—a corporation—and M & L—a sole proprietorship. London questions whether there was sufficient evidence to sustain a finding that the alleged enterprise was cognizable under RICO, arguing that (1) a RICO enterprise cannot be an association of legal entities; (2) the enterprise did not have a "common or shared purpose which animates those associated with it" and did not "function as a continuing unit" with an "ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity," see United States v. Bledsoe, 674 F.2d 647, 665 (8th Cir.) (internal quotation marks omitted), cert. denied, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982); and (3) the enterprise was not distinct from London himself. We do not find these arguments convincing.

London's first argument is legal. The RICO statute states that the term " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). London contends that, under a plain reading of this provision, an association-in-fact RICO enterprise such as the one alleged here must be an association of *individuals,* and cannot include legal entities.

London's argument has been addressed to a number of circuit courts, and each has rejected it. See, e.g., United States v. Console, 13 F.3d 641, 652 (3d Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1660, 128 L.Ed.2d 377 (1994); United States v. Blinder, 10 F.3d 1468, 1473 (9th Cir.1993); Atlas Pile Driving Co. v. DiCon Fin. Co., 886 F.2d 986, 995 n. 7 (8th Cir.1989); United States v. Perholtz, 842 F.2d 343, 352–53 (D.C.Cir.), cert. denied, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988). And we recently indicated, without explicitly considering the issue, that an association between two legal entities and two individuals can constitute a RICO enterprise. See Libertad v. Welch, 53 F.3d 428, 444 (1st Cir.1995). Today we make explicit what we implied in Libertad: two or more legal entities *can* form or be part of an association-in-fact RICO enterprise. We think the Perholtz panel explained why rather well:

> [RICO] defines "enterprise" as *including* the various entities specified; the list of entities is not meant to be exhaustive. "There is no restriction upon the associations embraced by the definition...." United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). On the contrary, Congress has instructed us to construe RICO "liberally ... to effectuate its remedial purposes." Pub.L. 91–452, § 904(a), 84 Stat. 922, 947 (1970) (reprinted in note following 18 U.S.C. § 1961), quoted in Turkette, 452 U.S. at 587, 101 S.Ct. at 2531; accord Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985). [The] restrictive interpretation of the definition of enterprise would contravene this principle of statutory construction.

[The restrictive] reading of section 1961(4) [also] would lead to the bizarre result that only criminals who failed to form corporate shells to aid their illicit schemes could be reached by RICO. The interpretation hardly accords with Congress' remedial purposes: to design RICO as a weapon against the sophisticated racketeer as well as (and perhaps more than) the artless.

842 F.2d at 343.

We therefore reject London's argument that an association-in-fact RICO enterprise cannot be comprised of legal entities.

London's second argument presumes that this circuit has adopted the test established in *Bledsoe*, 674 F.2d at 665, and set forth above. *See supra* at 1242–1243. We have not and do not do so today, because even if we assume *arguendo* the test's applicability, there was ample evidence for the jury to have found that its requirements were met.

■ The jury could have found that there was a common or shared purpose animating both the enterprise and London: doing commerce with (and thereby profiting from) bookmakers engaged in illegal gambling. The evidence that London as an individual pursued such a scheme is overwhelming and does not need repeating. Moreover, M & L and Heller's were the principal means by which London effectuated his plan. The jury reasonably found that London used M & L to launder (for a profit) the proceeds of illegal gambling for his bookmaker customers, and could have found that he used the privacy afforded by Heller's to shield M & L from close scrutiny, to arrange meetings between Ferrara and his bookmaker customers, and to collect "rent" for Ferrara.

■ The jury also could have found that the enterprise functioned as a continuing unit and had an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity. As to the latter of these two requirements, M & L and Heller's were legitimate entities that did a significant amount of business completely separate from the pattern of racketeering activity at issue in this case. Heller's was a bar where drinks and food were sold. M &

L was a check-cashing business—located inside of Heller's and operated by the same individual who ran Heller's—that cashed checks for customers willing to pay it a commission. As to the former requirement, the jury could reasonably have surmised that M & L and Heller's operated as a symbiotic unit (M & L providing a ready source of cash for Heller's customers; Heller's customers taking advantage of M & L's convenience), and that they existed for a common purpose: the economic gain of London.

We therefore reject London's argument that the *Bledsoe* standard has not been met in this case.

■ London's third argument derives from the fact that "[w]e have consistently interpreted [RICO's] requirement that a culpable person be 'employed by or associated with' the RICO enterprise as meaning that the same entity cannot do double duty as both the RICO defendant and the RICO enterprise." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir.1991) (quoting 18 U.S.C. § 1962(c)). He contends that he, the defendant named in the indictment, is legally indistinguishable from M & L and Heller's.

His argument overlooks the fact that M & L, though a sole proprietorship, had at least one employee other than himself, and the fact that Heller's was incorporated and had several employees other than himself. No more is required to establish the separateness required by RICO. As Judge Posner explained in responding to a similar argument:

If the one-man band incorporates, it gets some legal protections from the corporate form, such as limited liability; and it is just this sort of legal shield for illegal activity that RICO tries to pierce. A one-man band that does not incorporate, that merely operates as a proprietorship, gains no legal protections from the form in which it has chosen to do business; the man and the proprietorship really are the same entity in law and fact. But if the man has employees or associates, the enterprise is distinct from him, and it then makes no difference, so far as we can see, what legal form the enterprise takes. The only im-

portant thing is that it be either formally (as when there is incorporation) or practically (as when there are people besides the proprietor working in the organization) separable from the individual.

*McCullough v. Suter,* 757 F.2d 142, 144 (7th Cir.1985).

We therefore reject London's argument that he and the RICO enterprise alleged in the indictment are legally indistinguishable.

### 3. Nexus between Enterprise and Racketeering Acts Involving Extortion and the Collection of Illegal Debt

London's final argument is that there was no nexus between the enterprise and the racketeering acts involving extortion and the collection of illegal debt, and that we therefore must set his RICO convictions aside. We need not and do not reach this argument. As we have pointed out, London's RICO convictions are sustainable so long as we can tell with certainty that the jury found that he committed two sufficient predicate acts. *See supra* at 1242 (quoting *Angiulo,* 847 F.2d at 968). Here, the jury sustainably found that London committed numerous predicate acts of money laundering. Thus, even if there were no nexus between the enterprise and the racketeering acts involving extortion and the collection of illegal debt (an issue on which we express no opinion), we would sustain London's RICO convictions.

### III.

For the reasons stated, the judgment of the district court is *affirmed.*

Before TORRUELLA, Chief Judge, COFFIN and BOWNES, Senior Circuit Judges, SELYA, CYR, BOUDIN, STAHL and LYNCH, Circuit Judges.

### ORDER OF COURT

The panel of judges that rendered the decision in this case having voted to deny the petition for rehearing submitted by the appellant and the suggestion for the holding of a rehearing en banc having been carefully considered by the judges of the court in regular active service and a majority of said judges not having voted to order that the appeal be heard or reheard by the court *en banc.*

It is ordered that a petition for rehearing and a suggestion for rehearing *en banc* be denied.

TORRUELLA, Chief Judge (dissenting).

I believe the panel opinion in this case is contrary to the Supreme Court's decision in *Ratzlaf v. United States,* — U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). I reach this conclusion for primarily two reasons.

First, *Ratzlaf* held that in order to sustain a conviction for "structuring" under 31 U.S.C. § 5324(3) the government must prove that the defendant acted with knowledge that his conduct was unlawful. In my view, the clear implication, if not the plain language, of *Ratzlaf* precludes a structuring conviction based on the "reckless disregard" theory utilized in this case. Second, in denying the petition, the majority virtually ignores the fact that our decision in *United States v. Aversa,* 984 F.2d 493 (1st Cir.1993) (en banc), which upheld a reckless disregard jury instruction, was vacated and remanded by the Supreme Court "for further consideration in light of" *Ratzlaf. See Donovan v. United States,* — U.S. ——, 114 S.Ct. 873, 127 L.Ed.2d 70 (1994). Because the Court had just decided *Ratzlaf,* one would think that if *Aversa* was consistent with that case the Court would simply have denied the writ of certiorari. The most logical inference from this state of affairs is that the Court viewed our pre-*Ratzlaf* decision in *Aversa* as contrary to *Ratzlaf,* and wanted to give us a chance to remedy it. We should do so.

Because I believe the panel opinion misinterprets settled law, I dissent from the denial of the petition for rehearing or rehearing *en banc.*