T.C. Memo. 1998-346


UNITED STATES TAX COURT


MICHAEL LONDON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

PATRICIA LONDON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 24601-93, 18987-94.   Filed September 29, 1998.


<u>Henry D. Katz</u>, for petitioner Michael London.

<u>Eugene F. Sullivan, Jr.</u> and <u>Francis J. DiMento</u>, for petitioner Patricia London.

<u>Christine Colley</u> and <u>Ronald F. Hood</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following deficiencies in and additions to petitioners' Federal income tax:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| 1983 | $148,421 | $74,211 | 50% of the interest due on $148,421 | $37,105 |
| 1985 | 105,160 | 52,580 | 50% of the interest due on $105,160 | 26,290 |

All section references are to the Internal Revenue Code as in effect during the years in issue.

After concessions, the issues for decision are: (1) Whether Mr. London's deposition in a prior proceeding is admissible in evidence on the ground that he is unavailable as a witness within the meaning of rule 804(a) of the Federal Rules of Evidence due to his refusal to answer any of the questions put to him on Fifth Amendment grounds; (2) whether the tapes and transcripts from the electronic surveillance conducted at Mr. London's business and the evidence derived therefrom are admissible in evidence; (3) whether petitioners failed to report income in 1983 and 1985, as determined by respondent using the net worth method of reconstructing income; (4) whether petitioners are liable for additions to tax for fraud under section 6653(b)(1) and (2) for 1983 and 1985; (5) whether petitioners are liable for additions to tax for substantial understatement of liability under section 6661(a) for 1983 and 1985; (6) whether Mrs. London intended to file a joint

return for 1985; and (7) whether Mrs. London qualifies as a so-called "innocent spouse".

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Petitioners are husband and wife. They filed a joint Federal income tax return for each of the years in issue. Respondent issued a separate notice of deficiency to each petitioner, and each petitioner filed a petition for redetermination in this Court. The two cases were consolidated pursuant to Rule 141(a), Tax Court Rules of Practice and Procedure. In this opinion, all Rule references are to the Tax Court Rules of Practice and Procedure. At the time they filed their petitions, Mr. London resided in Lewisburg, Pennsylvania, and Mrs. London resided in Weston, Massachusetts. In this opinion, we sometimes refer to Mr. London as petitioner.

Mr. London graduated from high school in 1957. From 1957 to 1962, he attended Bordentown Military Academy, the University of Maryland, and Boston University, but he did not graduate from any of those institutions. Mrs. London received a bachelor of arts degree from Emmanuel College where she majored in biology. She also received a teaching certificate from Salem State College. After graduating

from college, Mrs. London worked for Massachusetts Institute of Technology as a laboratory assistant. She was later employed by the New England Baptist Hospital where she taught biological studies to nursing students. She left her employment at the hospital in August 1969.

Petitioners were married on May 22, 1969, in Chelsea, Massachusetts. After they were married, they rented an apartment in an area known as Glovers Landing, in Marblehead, Massachusetts, where they resided for approximately 3 years before moving to an apartment on Blueberry Hill Road, in Marblehead, Massachusetts. Petitioners lived in that apartment until September 10, 1976, when they purchased a house at 79 Black Oak Road, Weston, Massachusetts.

Petitioners had four children, Roanna, Terrence, Hellene, and Shauna. Roanna attended Colgate University from 1987 through 1991, Terrence attended the University of Michigan from 1989 through 1993, Hellene attended the University of Vermont from 1992 through 1996, and Shauna was a first year student at Georgetown University at the time of trial. Terrence received a partial athletic scholarship during college. Petitioners paid the tuition for each child's college education.

London's Cafe, Inc.

From 1957 through 1985, Mr. London was a stockholder in London's Cafe, Inc., a corporation which operated a bar in Chelsea, Massachusetts. Prior to 1974, the bar was owned and managed by Mr. London's parents, who also held the bar's liquor license. According to records filed with the Secretary of State of the Commonwealth of Massachusetts in 1960, petitioner's mother, Mrs. Ida London, was president and treasurer of the predecessor of London's Cafe, Inc., and petitioner's father, Mr. Isadore London, was an officer of the corporation.

Gradually, petitioners took over more of the ownership of the corporation, London's Cafe, Inc., and Mr. London took more responsibility for operation of the bar. In an application filed with the liquor licensing authority in the Commonwealth of Massachusetts on March 28, 1974, Mrs. London is identified as the owner of 51 of the 100 outstanding shares of stock and as a director of the corporation. Petitioner's mother is identified as the owner of 49 shares and as president of the corporation. Mr. London is identified as "clerk". Shortly thereafter, in April 1974, Mrs. London applied for and was granted the liquor license to operate London's Cafe, Inc., d/b/a Heller's Cafe. Mrs. London is identified in the

application as "Manager and Director".  The parties have stipulated that Mrs. London was the "liquor licensee" of London's Cafe, Inc., d/b/a/ Heller's Cafe from 1974 through at least December 1986.  In this opinion, we refer to the corporation as London's Cafe, Inc., and to the bar as Heller's Cafe.

Check-Cashing Business

From 1977 through 1993, Mr. London also conducted a check-cashing business as a sole proprietorship, M.L. Associates, from an enclosed area in Heller's Cafe.  M.L. Associates charged its customers a fee for cashing checks. The fee ranged from 1 to 15 percent of the total amount of the check.  Mr. London also lent money to customers and charged various rates of interest ranging from 5 to 200 percent per week.

Mr. London used two bank accounts for the check-cashing business, Essex Bank account No. 069-159-7 and Shawmut County Bank account No. 616-781-0.  During the years 1980 through 1985, the aggregate deposits made to these accounts are as follows:

| Year | Amount |
|------|--------|
| 1980 | $16,074,523.13 |
| 1981 | 16,827,056.79 |
| 1982 | 21,791,552.32 |
| 1983 | 29,202,291.31 |

| | |
|---|---|
| 1984 | 31,614,968.77 |
| 1985 | 40,767,857.96 |
| Total: | 156,278,250.28 |

M.L. Associates issued Forms W-2, Wage and Tax Statement, to petitioners' children, Roanna and Terrence, for 1983, 1984, and 1985. The Forms W-2 report that each child was paid $3,600, $3,900, and $3,900 for 1983, 1984, and 1985, respectively.

Petitioner's Criminal Activity

On August 6, 1969, the police raided Heller's Cafe. They arrested Mr. Isadore London for "allowing his premises to be used for gaming", and they arrested petitioner for "setting up and promoting a lottery". In September 1969, the U.S. District Court for the District of Massachusetts found petitioner and his father guilty of those offenses.

Mr. London and his father were arrested a second time in 1974. On November 7, 1974, they were indicted and on July 24, 1975, they pleaded guilty to unlawfully, knowingly, and willfully conducting an illegal gambling business in violation of title 18 U.S.C. sections 1955 and 2. They were each sentenced to 2 years in prison. The sentences were suspended and they were placed on probation

for 2 years.  Mr. London was fined $5,000, and his father was fined $1,000.

From 1983 through 1985, officials from the Criminal Investigation Division of the Internal Revenue Service, the Drug Enforcement Administration, the Federal Bureau of Investigation (FBI), and the Massachusetts State police investigated Heller's Cafe for possible violation of the laws prohibiting gambling, loan-sharking, drug trafficking, money laundering, and for possible failure to submit currency transaction reports (CTR's).

On October 28, 1986, in response to an application and affidavit submitted by Federal agents, the U.S. District Court for the District of Massachusetts issued two orders authorizing Federal agents to conduct electronic surveillance at Heller's Cafe for a 30-day period.  One order authorized the agents to intercept communications in and adjacent to the enclosed area where Mr. London conducted the business of M.L. Associates.  The second order authorized Federal agents to monitor and record telephone communications on two telephones at Heller's Cafe, a pay phone located on the premises and a private phone line belonging to M.L. Associates.  The District Court extended the orders for an additional 30 days on December 3, 1986.  Federal agents terminated electronic

surveillance of Heller's Cafe before the end of December 1986.

On December 17, 1986, pursuant to a search warrant, a task force of FBI agents and Massachusetts State police officers conducted a search of Heller's Cafe. The search warrant authorized the task force to search for evidence of unlawful gambling, loan-sharking, distribution of narcotics, money laundering, and failure to file CTR's. During the course of the search, the agents seized drugs, weapons, records of M.L. Associates, records of bookmaking activities, and money in the aggregate amount of $125,376, consisting of a $20,000 cashier's check and currency of $105,376 found in a safe in the enclosed area. Mr. London was present when Federal agents searched Heller's Cafe.

On April 11, 1990, Mr. London was indicted by a Federal grand jury for two counts of income tax evasion in violation of section 7201. The grand jury returned superseding indictments on May 10, 1990, and on September 5, 1991. The second superseding indictment charged Mr. London with the following violations of the law:

| Count No. | Title and Sec. | Nature of Offense |
|-----------|----------------|-------------------|
| 1 | 18 U.S.C. 1962 | RICO--conspiracy |
| 2 | 18 U.S.C. 1962(c) and 2 | RICO--substantive |

| 3--16 | 18 U.S.C. 1956 and 2 | Money Laundering |
|---|---|---|
| 17--43 | 31 U.S.C. 5313, 5322(b) | Failure to file CTR's |
| 44 | 18 U.S.C. 1951 | Conspiring to commit extortion |
| 45--47 | 18 U.S.C. 1951 and 2 | Aiding and abetting extortion |
| 48 | 18 U.S.C. 894 | Loan-sharking |
| 49 | 18 U.S.C. 1955 and 2 | Operating a gambling business |
| 50 | 26 U.S.C. 7201 | Tax evasion for 1983 |
| 51 | 26 U.S.C. 7201 | Tax evasion for 1985 |

By the start of Mr. London's trial on January 4, 1993, the 51 counts of the second superseding indictment had been reduced to 30 counts. Several counts, including the count charging Mr. London with gambling, were dismissed by the Government, and several other counts were dismissed by the District Court. The two counts of tax evasion (counts 50 and 51) were among the counts that were not tried, but the record of these cases does not explain why. On February 19, 1993, a jury returned guilty verdicts with respect to 29 counts involving RICO, money laundering, failure to file CTR's, and extortion. The jury acquitted Mr. London on one count of money laundering. During the jury trial, the contents of the communications intercepted during the electronic surveillance of Heller's Cafe were introduced into evidence. On March 3, 1993, Mr. London pleaded guilty to willful evasion of his 1985 Federal income tax under section 7201.

On June 30, 1993, the District Court gave Mr. London the following sentence for all of the offenses on which he was convicted:

> The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 188 months on counts 1 & 2, 5-16, 44, 45 & 47 to be served concurrently with each other; 96 months on counts 17, 18, 21, 23, 25, 26, 29, 32, 34, 35, 37 & 40 to be served concurrently with each other and with counts 1 & 2; 48 months on count 51, to be served concurrently with counts 1 & 2.

> The defendant is remanded to the custody of the United States marshal.

The District Court fined him $500,000 on counts 5 through 16 for money laundering. On the same day, the District Court also entered an Order of Forfeiture under which it gave the United States title to an additional $865,000 which Mr. London had agreed to forfeit. The District Court entered judgment against Mr. London for his criminal offenses on July 7, 1993. This judgment was affirmed by the U.S. Court of Appeals for the First Circuit, United States v. London, 66 F.3d 1227 (1st Cir. 1995).

Heller's Cafe Liquor License

On December 13, 1993, the Board of Excise of the City of Chelsea, issued a "Decision" revoking the liquor license of Heller's Cafe, effective December 20, 1993. The decision states in relevant part:

> the Board finds that the Licensee [London's Cafe, Inc.] permitted a violation of a condition of its license or of the laws of the Commonwealth of Massachusetts by permitting Mr. London to use the licensed premises for a racketeering enterprise, loan sharking, extortion, money laundering and currency violations.

In its decision, the Board of Excise also found the following:

> All of the issued and outstanding stock of London's Cafe, Inc., d/b/a Heller's Cafe ("Heller's"), is and was at all times relevant hereto owned of record by Patricia London. Mrs. London was and is the licensed manager at all times relevant hereto.

On June 22, 1994, the Alcoholic Beverages Control Commission of the Commonwealth of Massachusetts approved the Board's decision, and that action was affirmed on October 30, 1995, by the Superior Court of the Commonwealth of Massachusetts, Suffolk County. The memorandum of decision and order issued by the Superior Court on October 30, 1995, states that "Patricia London was the

record owner and manager of Heller's from 1985 to December, 1993."

Wrongful Levy Suit

In 1993, the Commissioner levied on stock brokerage accounts at Paine Webber and Kidder Peabody which petitioners owned jointly.  Mrs. London challenged the levy in a civil suit brought against the Commissioner in the U.S. District Court of the District of Massachusetts.  The Government took Mr. London's deposition while the suit was pending.  In 1996, the parties to the suit agreed to a settlement under which Mrs. London received $214,342 of assets in the Paine Webber account and she was permitted to keep her individual retirement account at Paine Webber, amounting to $91,472.22, as of March 1996.  Under the settlement, Mrs. London also retained one-half of the Kidder Peabody account or approximately $60,000.

Bank Accounts

During the years 1976 through 1985, petitioners either individually, jointly, or with Mr. London's parents, maintained the following bank accounts:

| Bank Accounts | Account No. | Date Opened |
|---|---|---|
| Broadway Natl. Bank | 90-378-7 | 1/3/84 |
| Broadway Natl. Bank | 58-063-5 | Before 1975 |
| Broadway Natl. Bank | 63-450-6 | 3/24/80 |
| Broadway Natl. Bank | 41-028-4 | 2/13/68 |
| Broadway Natl. Bank (Heller's Cafe) | 41-001-2 | 3/2/60 |
| Carmel Credit Union | 21614 | Before 12/31/76 |
| Carmel Credit Union | 17795 | Before 1/1/77 |
| Essex Bank (M.L. Associates) | 069-159-7 | 6/81 |
| Provident Inst. for Sav. | 88-6612 | 8/25/69 |
| Shawmut County Bank (Roanna) | 685-946-1 | 1/4/84 |
| Shawmut County Bank (M.L. Associates) | 616-781-0 | During 1977 |
| Shawmut County Bank | 633-084-3 | 8/6/77 |

Mrs. London wrote checks on the three accounts which she held jointly with her husband, Broadway National Bank account No. 90-378-7, Broadway National Bank account No. 63-450-6, and Shawmut County Bank account No. 633-084-3.

In addition to the above accounts, petitioners reported on the Schedules B, Interest and Dividend Income, filed as part of their Federal income tax returns for 1976 through 1981 that they had received interest income from accounts at five banks, Atlantic Savings Bank, Commonwealth Bank, Marblehead Savings Bank, Metropolitan Credit Union, and Grand National Bank.  The interest reported from those accounts is set out in the following schedule:

| | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|---|---|---|---|---|
| Atlantic Sav. | $897 | $313 | $155 | $683 | $30 | $16 | -- | -- | -- | -- |
| Metro. Credit Union | -- | 71 | 661 | -- | -- | -- | -- | -- | -- | -- |
| Metro. Credit Union | -- | 71 | -- | -- | -- | -- | -- | -- | -- | -- |
| Metro. Credit Union | -- | 71 | -- | -- | -- | -- | -- | -- | -- | -- |
| Commonwealth Bank | 60 | 151 | 519 | -- | 623 | -- | -- | -- | -- | -- |
| Commonwealth Bank | 141 | 151 | -- | -- | -- | -- | -- | -- | -- | -- |
| Commonwealth Bank | 159 | 174 | -- | -- | -- | -- | -- | -- | -- | -- |
| Commonwealth Bank | 141 | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Natl. Grand Bank | 452 | 225 | -- | -- | -- | -- | -- | -- | -- | -- |
| Natl. Grand Bank | 479 | 255 | -- | -- | -- | -- | -- | -- | -- | -- |
| Natl. Grand Bank | 482 | 211 | -- | -- | -- | -- | -- | -- | -- | -- |
| Marblehead Sav. | 590 | -- | 3 | -- | -- | -- | -- | -- | -- | -- |

They also reported receiving a small amount of interest

income during each of the years 1982 through 1985 from an

account at Boston Five Cents Savings.

Stocks

Petitioners purchased the following stocks and

securities during the period 1976 through 1985:

| Name | No. of Units | Date Purchased |
|------|--------------|----------------|
| AT&T | 150 | Pre-1977 |
| General Motors Corp. | 150 | Pre-1977 |
| Boston Edison | 200 | Pre-1977 |
| John Hancock | 200 | Pre-1977 |
| Big Piney Oil & Gas | 2,000 | 5/27/81 |
| Mass. St. Go. 5.8 JJ | 150,000 | 10/01/81 |
| Mass. St. Go. 6.4 JJ | 60,000 | 10/27/81 |
| Utah Power & Light | 2,000 | 12/17/81 |
| Xerox Corp. | 600 | 2/16/82 |
| Santa Fe S. Pac. | 1,804 | 2/26/82 |
| Florida Fed. Sav. | 1,000 | 6/03/83 |
| San Diego Gas & Elec. | 2,000 | 6/08/83 |
| Western Co. of N. Am. | 3,000 | 6/08/83 |
| Isomedix, Inc. | 500 | 7/21/83 |
| Haber, Inc. (Silver Tech) | 11,000 | [1] |
| Pension Ins. Group Am. | 6,000 | 2/14/84 |
| Arkla, Inc. | 1,200 | 3/01/84 |
| Mass. St. Go. 6.5 FA | 150,000 | 4/26/84 |
| Zenith Natl. Ins. Corp. | 500 | 5/04/84 |
| Zenith Natl. Ins. Corp. | 1,500 | 5/07/84 |
| Mass. St. Go. 9.0 MS | 50,000 | 11/30/84 |
| So. Calif. Edison Co. | 200 | 4/25/85 |
| So. Calif. Edison Co. | 1,600 | 4/25/85 |
| Mass. Med. Ctr. 10.2 J | 10,000 | 4/25/85 |
| Mass. Med. Ctr. 10.4 J | 50,000 | 4/25/85 |
| Kidder Peabody Acct. Fund | [2] 122,203 | |

[1] An agreement to purchase the shares was signed by petitioners on 1/16/84.

[2] Value as of 12/31/85.

Petitioners reported on the Schedules B, Interest and

Dividend Income, filed as part of their returns for 1977,

1979, and 1980, that the General Motors, Boston Edison, John Hancock, and AT&T stocks were jointly owned. On the Schedule B filed as part of their return for 1984, petitioners also reported that they had received dividend income from Southwestern Bell, Ameritech, U.S. West, Bell Atlantic, NYNEX, Bell South, and Pacific Telesis.

Real Estate

On May 7, 1974, petitioners paid $15,050 to purchase the building at 110 Chestnut Street, Chelsea, Massachusetts, the site of Heller's Cafe. Title to the building was taken in Mrs. London's name d/b/a London Realty and was leased to London's Cafe, Inc. On June 1, 1974, petitioners paid $3,547 for improvements to the building.

On July 1, 1975, Mrs. London purchased a ½-acre tract of land in Marblehead, Massachusetts, for $37,000. She paid the purchase price by check on the same day. During 1975 and 1976, petitioners paid $4,500 and $11,500, respectively, for improvements to the land. Petitioners sold this property on August 2, 1984, for $125,000.

On September 10, 1976, petitioners purchased the property at 79 Black Oak Road, Weston, Massachusetts, as tenants by the entirety. They paid $146,000 for the property, $66,000 from their own funds, and $80,000 from

funds borrowed from the Broadway National Bank in Chelsea, Massachusetts. This property was petitioners' primary residence during the years at issue.

On October 7, 1982, Mr. London purchased a condominium unit, No. 304, located at 1265 Beacon Street, Brookline, Massachusetts, for $174,336. Petitioner borrowed the funds used to purchase the property from the Broadway National Bank. As collateral for the loan, petitioner gave the bank two certificates of deposit which were worth $100,882.29 and $100,909, respectively, as of October 12, 1982, the maturity date of both certificates. Petitioner sold the condominium unit on May 24, 1985, for $187,000.

On June 18, 1984, petitioners purchased property as tenants by the entirety at 140 Greeley Avenue, West Hyannis Port, Massachusetts, for $467,500 (Hyannis Port property). They borrowed $270,000 from the Broadway National Bank to purchase the property and agreed to repay the loan in 3 years with interest at the rate of 11.5 percent per year. The loan required petitioners to make monthly payments of $3,148.20 for 36 months and to pay the balance on June 18, 1987. Petitioners gave $198,737.35 of the loan proceeds to Alger & Schilling, the escrow attorneys, to pay part of the purchase price. They used $69,882.65 of the loan proceeds

to discharge the mortgage on their Weston property, and used the remaining $1,380 of the loan proceeds to pay for attorney and filing fees.  Petitioners paid the balance of the purchase price of the Hyannis Port property by depositing the following checks into the escrow account of Alger & Schilling:

| Amount | Payee | Bank |
|---|---|---|
| Mrs. London | Broadway Natl. Bank (BNB) acct. No. 90-378-7 | $2,968.00 |
| Mrs. London | Shawmut County Bank --cashier's check | 10,000.00 |
| Alger & Shilling | Cape Cod Co-op | 25,000.00 |
| Mrs. London | BNB--cashier's check | 100,000.00 |
| Mrs. London | BNB--cashier's check | 100,000.00 |
| Mrs. London | BNB--cashier's check | 30,000.00 |
| Mrs. London | BNB--cashier's check | 1,262.65 |
| | | 269,230.65 |

The following is a summary of petitioners' real estate:

| Real Estate | Purchase Date | Mrs. London | Mr. London | Joint | Total |
|---|---|---|---|---|---|
| 110 Chestnut St. Chelsea | 5/7/74 | $15,050 | -- | -- | -- |
| improvements | | 3,547 | -- | -- | $18,597 |
| Marblehead | [1]7/1/75 | 37,000 | -- | -- | -- |
| improvements | | 16,000 | -- | -- | 53,000 |
| 79 Black Oak Rd. Weston | 9/10/76 | -- | -- | $146,000 | 146,000 |
| 1265 Beacon St. Unit No. 304 Brookline | [2]10/7/82 | -- | $174,336 | -- | 174,336 |
| 140 Greeley Ave. | 6/18/84 | | | | |

| | | | |
|---|---|---|---|
| W. Hyannis Port improvements | -- | -- | 467,500 |
| | | | 77,013 | 544,513 |
| | 71,597 | 174,336 | 690,513 | 936,446 |

[1]Sold on 8/2/84.

[2]Sold on 5/24/85.

Financial Statement

On August 16, 1976, petitioners submitted a financial statement to the Broadway National Bank to obtain the loan, mentioned above, in connection with their purchase of the property located at 79 Black Oak Road, Weston, Massachusetts.  The statement was signed by Mr. London and provides the following information:

Assets
Cash on hand in banks                                          $85,000

U.S. Government Securities:
Series E bonds                                                  20,000

| Listed Securities: | Market Value |
|---|---|
| 150 Shares Am. Tel. | $8,000 |
| 150 Shares General Motors | 9,000 |
| 200 Shares Boston Edison | 6,000 |
| 200 Shares John Hancock | 4,000 |

27,000

| Real Estate Owned: | Cost |
|---|---|
| Brick bldg.--Chelsea, MA | 18,597 |
| Land--Marblehead, MA | 37,500 |

56,097

Autos and other personal property                              14,000
Cash value life insurance

2,500

Other Assets:
Investment in M.L. Associates                              50,000

   Total assets                                          254,597

Liabilities
Notes payable to banks--secured:
Automobiles                                                 3,000

   Total liabilities                                       3,000

Net worth                                                 251,597


## Jewelry and Home Furnishings

On December 20, 1984, petitioners' Hyannis Port house was burglarized.  In reporting the burglary to the police, petitioners claimed that property worth approximately $29,027 was stolen.  Among the stolen items they reported to their insurance company, there were six oriental rugs worth about $10,560, one Baume-Mercier watch worth about $3,500, several items of jewelry worth about $255, 12 five-piece sterling silver place settings worth about $4,500, and several paintings and a lithograph worth about $6,089.

## Automobiles

Petitioners purchased eight cars during the period from 1975 through 1985.  The following is a summary of the cars purchased by petitioners during that period:

| Cars | Date Purchased | Cost | Title |
|------|----------------|------|-------|
| 1975 Buick | 7/18/75 | $7,303 | Mrs. London |
| 1976 Volvo 265 DLA wagon | 7/16/76 | 8,400 | Mrs. London |
| 1978 Buick Estate wagon | 3/11/78 | 9,981 | Mrs. London |
| 1980 Cadillac Eldorado | 3/1/80 | 17,700 | Mrs. London |
| 1981 Volvo GLT station wagon | 6/30/81 | 14,976 | Mrs. London |
| 1982 Mercedes 500 SEC coupe | 2/10/83 | 35,000 | Mr. London |
| 1983 Mercedes 300 TDT station wagon | 8/29/83 | 35,000 | Mrs. London[1] |
| 1985 Mercedes 500 SEL sedan | 3/26/85 | 49,000 | Mr. London[2] |

[1]Mrs. London made a $15,000 downpayment and financed the balance. Petitioners paid the balance due on Jan. 12, 1984.

[2]Mr. London traded in his 1982 Mercedes, which had a trade-in value of $32,000, and he financed the balance by obtaining a loan from Broadway Natl. Bank for $20,000. Petitioners repaid the loan by Nov. 15, 1985.

## Petitioner's Parents

Both prior to and after petitioners' marriage, Mr. London's parents were involved with Mr. London in the operation of Heller's Cafe. Petitioner's father worked at the bar and petitioner's mother was responsible for ordering supplies for the bar, and paying some of the bar's bills. When petitioner's mother was not feeling

well, petitioner's wife would order supplies for the bar. Petitioner's father died on October 2, 1980.

From 1969 through 1982, petitioner's mother lived at 57 Franklin Avenue, Chelsea, Massachusetts. On February 11, 1981, she sold that property for $28,000 but she continued to live there for about 1 year after the sale. In 1982, she rented an apartment in a subsidized housing development located at 5 Admiral's Hill, Chelsea. She lived in that apartment from 1982 until her death on June 10, 1988.

During the period from 1975 through 1981, petitioner's mother received the following proceeds from the sale of real estate:

| Real Estate Sold | Date | Amount Received |
|---|---|---|
| 122-124 Everett Ave. 47-49-51 Elm St. 123-131 Spruce St. | 3/3/75 | [1]$49,784.47 |
| 400 and 402 Broadway | 9/15/80 | 27,000.00 |
| 57 Franklin Ave. | 2/11/81 | 28,000.00 |
| Total received: | | $104,784.47 |

[1]These properties were sold for $61,000. Petitioner's mother paid $215.53 in taxes and $11,000 to discharge a mortgage on the property and she received the difference $49,784.47 ($61,000 - $11,215).

All of the above properties are located in Chelsea, Massachusetts.

Mr. London's parents held a safe deposit box (No. 1618) at the Broadway National Bank.  In June 1980, the safe deposit box was in the name of Mr. London and his parents as joint tenants.  In 1984, the safe deposit box was changed to another box, No. 891, and it was held jointly by petitioners and Mr. London's mother.

Petitioner's parents filed Federal income tax returns for taxable years 1966 through 1980.  His mother filed a Federal income tax return for the taxable year 1981, but she did not file individual income tax returns for taxable years 1982 through 1988.  Set out below is the amount of Federal income tax paid by petitioner's parents from 1966 through and including 1988:

| Year | Tax |
|------|-----|
| 1966 | $1,639.04 |
| 1967 | 1,843.34 |
| 1968 | 2,068.27 |
| 1969 | 2,316.72 |
| 1970 | 2,221.51 |
|      | (2,221.51) Tax abated |
| 1971 | 2,037.13 |
|      | (2,037.13) Tax abated |
| 1972 | 828.24 |
| 1973 | -- |
| 1974 | -- |
| 1975 | 4,905.00 |
| 1976 | 370.00 |
| 1977 | 116.00 |
| 1978 | 160.00 |
| 1979 | -- |
| 1980 | 1,445.00 |
| 1981 | 1,209.00 |
| 1982 | No return filed |
| 1983 | No return filed |
| 1984 | No return filed |
| 1985 | No refund filed |
| 1986 | No refund filed |
| 1987 | No refund filed |
| 1988 | No refund filed |

Petitioner's parents did not file a gift tax return (Form 709), or an estate tax return (Form 706), during the period from 1966 through 1994, and neither left a probate estate.

Petitioner and his parents shared a close personal and financial relationship. In fact, before he was married, petitioner gave his mother most of his earnings and kept only a small allowance. Through the years, petitioner and his parents purchased various assets jointly, including stocks and bonds.

Petitioners' Income Tax Returns

Mr. Gerald Silverstein, a public accountant, prepared petitioners' joint individual income tax returns for taxable years 1976 through 1985.  Mr. London annually provided Mr. Silverstein with the information necessary to prepare petitioners' individual returns.  From time to time, Mrs. London also delivered to Mr. Silverstein Forms 1099 and other information necessary to prepare the returns.  After Mr. Silverstein prepared each return, he would give it to Mr. London.  Mr. Silverstein signed petitioners' signatures on their return for 1984.  He was not present when petitioners' returns for 1983 and 1985 were signed.

Mr. Abraham Trugman, a certified public accountant, prepared the Schedules C, Profit or (Loss) From Business or Profession, for Mr. London's check-cashing business, M.L. Associates.  Mr. London supplied Mr. Trugman with bank statements, deposit slips, and machine tapes showing the weekly check-cashing income of the business.  Mr. London forwarded the Schedules C to Mr. Silverstein for use in preparing petitioners' joint individual income tax returns. Mr. Trugman never met Mr. Silverstein.

The following is a summary of the joint income tax returns filed by, or on behalf of, petitioners for 1976 through 1985:

| | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|---|---|---|---|---|
| Wages | -- | -- | -- | [1]$2,600 | -- | -- | -- | -- | -- | -- |
| Wages-- Heller's Cafe | | | | | | | | | | |
| Mrs. London | $2,650 | $2,600 | $2,600 | -- | $2,600 | $2,600 | $2,650 | $2,600 | $2,600 | $2,600 |
| Mr. London | 13,950 | 18,200 | 2,600 | -- | -- | -- | -- | -- | -- | -- |
| Wages-- M.L. Associates | | | | | | | | | | |
| Mrs. London | -- | -- | -- | -- | -- | -- | -- | 1,920 | 2,080 | 3,900 |
| Mr. London | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Schedule B Interest income | 4,056 | 2,794 | 2,345 | 2,905 | 10,812 | 27,431 | 18,043 | 29,212 | 31,954 | 37,095 |
| Dividend[2] | 2,346 | 2,187 | 2,192 | 2,197 | 2,045 | 1,914 | 9,432 | 7,207 | 17,580 | 15,332 |
| State refund | -- | -- | 500 | 87 | -- | -- | -- | -- | -- | -- |
| Schedule C M.L. Associates | -- | 2,432 | 46,992 | 51,255 | 53,068 | 64,180 | 63,969 | 70,009 | 91,340 | 101,671 |
| Schedule D Capital gain | -- | -- | -- | -- | -- | -- | -- | -- | 38,060 | 10,226 |
| Schedule E 110 Chestnut St.[3] | 20,454 | 12,712 | 1,052 | 187 | 1,831 | (1,207) | 4,100 | (2,044) | (1,512) | (3,128) |
| Total income | 43,456 | 40,925 | 58,281 | 59,231 | 70,356 | 94,918 | 98,194 | 108,904 | 182,102 | 167,696 |
| Taxable income | 28,519 | 27,418 | 41,836 | 43,595 | 54,427 | 69,571 | 74,868 | 65,001 | 112,665 | 96,882 |

[1]No Form W-2, Wage and Tax Statement, attached to 1979 return.

[2]Dividend income after exclusion.

[3]Rental income from 110 Chestnut St., the site of Heller's Cafe was reported on petitioners' Schedule E.

Each of petitioners' returns describes the occupation of both Mr. and Mrs. London as "manager". Mrs. London received Forms W-2, Wage and Tax Statement, from London's Cafe, Inc., and M.L. Associates reporting the following wages:

| Year | London's Cafe, Inc. | M.L. Associates |
|------|---------------------|-----------------|
| 1976 | $2,650 | -- |
| 1977 | 2,600 | -- |
| 1978 | 2,600 | -- |
| 1979 | -- | -- |
| 1980 | 2,600 | -- |
| 1981 | 2,600 | -- |
| 1982 | 2,650 | -- |
| 1983 | 2,600 | $1,920 |
| 1984 | 2,600 | 2,080 |
| 1985 | 2,600 | 3,900 |

Petitioners' returns also report individual retirement account contributions on behalf of Mrs. London in the amount of $390 for each year 1976 through and including 1981, and in the amount of $2,000 for 1982 through and including 1985. We note that petitioners' return for 1977 includes Form 5329, Return for Individual Retirement Savings Arrangement, on behalf of Mrs. London, on which "No" is checked in response to the question "Are you a non-working spouse for whom this arrangement has been established?" We also note that petitioners' returns for 1982 through and including 1985 include Schedule W, Deduction for a Married Couple When Both Work, on which

petitioners claimed deductions provided by section 221(a) for two-earner married couples.

Petitioners filed no Federal income tax return for taxable years 1986 through 1993. They made the following estimated tax payments for those years:

| Year | Estimated Tax |
|------|---------------|
| 1986 | $34,700 |
| 1987 | 36,000 |
| 1988 | 36,000 |
| 1989 | 36,000 |
| 1990 | 40,046 |
| 1991 | 48,000 |
| 1992 | 24,000 |
| 1993 | 12,000 |

## Returns of London's Cafe, Inc.

Mr. Silverstein prepared returns on Forms 1120, U.S. Corporation Income Tax Return, for London's Cafe, Inc., for taxable years 1976 through 1985. For each of those 10 years, London's Cafe, Inc., reported zero taxable income. The following schedule summarizes the amounts reported on behalf of London's Cafe, Inc.:

| | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|------|------|------|------|------|------|------|------|------|------|
| Gross receipts | $63,052 | $66,650 | $56,807 | $52,236 | $52,385 | $54,777 | $55,654 | $63,989 | $66,146 | $77,369 |
| Cost of goods | 32,875 | 34,992 | 43,596 | 41,069 | 40,932 | 43,342 | 42,966 | 51,036 | 53,982 | 62,769 |
| Gross profit | 30,177 | 31,658 | 13,211 | 11,167 | 11,453 | 11,435 | 12,688 | 12,953 | 12,164 | 14,600 |
| Total deduction | 30,840 | 34,506 | 13,757 | 11,552 | 10,878 | 10,049 | 11,435 | 11,424 | 10,797 | 12,584 |
| Taxable income before certain deductions | (663) | (2,848) | (546) | (385) | 575 | 1,386 | 1,253 | 1,529 | 1,367 | 2,016 |
| Net operating loss deduction | -- | -- | -- | -- | 575 | 1,386 | 1,253 | 1,529 | 1,367 | 2,016 |
| Taxable income | (663) | (2,848) | (546) | (385) | -- | -- | -- | -- | -- | -- |

The returns were signed by the following individuals:

| Taxable Year | Officer's Signature | Officer's Title |
|---|---|---|
| 1976 | Mrs. Ida London | Treasurer |
| 1977 | Mrs. London | Director |
| 1978 | Mr. London | Clerk |
| 1979 | Mrs. London | Clerk |
| 1980-85 | Mr. London | Clerk |

Respondent's Determination

Respondent recomputed petitioners' taxable income for 1983 and 1985 using the net worth method of reconstructing income. As the starting point for that computation, respondent used the net worth shown on the financial statement that petitioners submitted to the Broadway National Bank in 1976, $251,597. Respondent then computed petitioners' net worth for 1976 through 1985.

Respondent determined that petitioners had received unreported income of $311,974 and $213,120 for taxable years 1983 and 1985, respectively. The "explanation of items" attached to the notice of deficiency issued to Mrs. London states as follows:

It is determined that you realized additional income [for 1983] in the amount of $311,974.00 because the comparison of all known expenditures with all known receipts, as shown on Exhibit A attached hereto, has established an understatement of income. Since you failed to include such additional income on your income tax return, taxable income is increased in the amount of $311,974.00.

\*   \*   \*   \*   \*   \*   \*

It is determined that you realized additional
income [for 1985] in the amount of $213,120.00
because the comparison of all known expenditures
with all known receipts, as shown on Exhibit A
attached hereto, has established an understate-
ment of income.  Since you failed to include
such additional income on your income tax return,
taxable income is increased in the amount of
$213,120.00.

Based thereon, respondent computed increases in tax of

$148,421 and $105,160 for 1983 and 1985, respectively.

Respondent also determined with respect to 1983 and 1985

that petitioners are liable for the additions to tax for

fraud under section 6653(b)(1) and (2), and the addition

to tax for substantial understatement of liability under

section 6661.

OPINION

Admissibility of Mr. London's Deposition in the Wrongful
Levy Suit

At trial, Mrs. London called her husband to testify as

a witness.  In response to each of the questions put to him

by Mrs. London's attorney and by the Court, Mr. London

invoked his Fifth Amendment privilege against self-

incrimination and refused to answer the question.  Counsel

for Mrs. London then offered into evidence the deposition

of Mr. London taken during the wrongful levy suit,

described above.  Petitioners argue that Mr. London is "unavailable" as a witness in these cases because he validly claimed his privilege against self-incrimination under the Fifth Amendment (see rule 804(a)(1) of the Federal Rules of Evidence), or because he would have persisted in refusing to testify despite any order of this Court directing him to do so (see rule 804(a)(2) of the Federal Rules of Evidence).  Accordingly, petitioners argue that Mr. London's deposition is admissible into the record of these cases under rule 804(b)(1) of the Federal Rules of Evidence, which provides an exception to the hearsay rule with respect to former testimony of the declarant.

Respondent objects to the admission of Mr. London's deposition into evidence.  Respondent asserts that the deposition is hearsay for which there is no exception. Respondent asserts that Mrs. London has not shown her husband's "unavailability" as a witness within the meaning of that term in rule 804(a) of the Federal Rules of Evidence.  In this connection, respondent asserts that Mr. London did not validly claim the Fifth Amendment privilege against self-incrimination because any criminal prosecution of him is remote or speculative.  Respondent also asserts that the Court did not order Mr. London to

testify, and, thus, there is no basis to claim his unavailability on the ground that he persisted in refusing to testify in the face of an order of the Court to do so. Moreover, respondent asserts that, even if the Court finds that Mr. London is unavailable, his deposition in the wrongful levy suit is not the type of former testimony described by rule 804(b)(1) of the Federal Rules of Evidence because the purpose of the deposition was to investigate Mrs. London's claim of an interest in two brokerage accounts, neither of which was included as an asset in the net worth statement used in these cases.

Notwithstanding respondent's objection to the introduction of the entire deposition into evidence, respondent proffered approximately 11 pages of the deposition as an admission by a party opponent. In response, petitioners argue that if this portion of the deposition is accepted into evidence, then rule 106 of the Federal Rules of Evidence requires the receipt of the entire deposition into evidence on the ground that the entire deposition "ought in fairness to be considered contemporaneously with" the portion introduced by respondent.

In reviewing Mr. London's Fifth Amendment claims, it is worthwhile to review the following statement from our opinion in Petzoldt v. Commissioner, 92 T.C. 661, 684 (1989):

> It is well established that the Fifth Amendment may excuse a taxpayer from responding to discovery or from testifying in this Court. Dellacroce v. Commissioner, supra. [83 T.C. 269 (1984).] The witness may invoke the privilege when he reasonably apprehends a risk of self-incrimination although no criminal charges are pending against him. Marchetti v. United States, 390 U.S. 39, 53 (1968); Hoffman v. United States, 341 U.S. 479, 486 (1951). The privilege not only extends to testimony which would support a conviction, but also to testimony which would furnish a link in the chain of evidence needed to prosecute. Hoffman v. United States, supra. If the testimony is incriminating, then the propriety of invoking the privilege depends on whether the risk of prosecution is real. Zicarelli v. New Jersey State Commission of Investigation, 406 U.S. 472, 478 (1972); Marchetti v. United States, supra at 53; Stubbs v. Commissioner, 797 F.2d 936, 938 n.2 (11th Cir. 1986), affg. per curiam an unreported order and decision of this Court. It is further well established that the privilege does not protect against a fear of prosecution which is remote, speculative, or fanciful. Zicarelli v. New Jersey State Commission of Investigation, supra; Marchetti v. United States, supra; Stubbs v. Commissioner, supra. However, the privilege must be accorded liberal construction in favor of the right it was intended to secure. Hoffman v. United States, supra.

The Supreme Court stated in Hoffman v. United States, 341 U.S. 479, 488 (1951), that under the Fifth Amendment

a response may not be compelled unless it is "'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer(s) cannot possibly have such tendency' to incriminate." Hoffman v. United States, supra at 488 (quoting Temple v. Commonwealth, 75 Va. 892, 898 (1880)).

In these cases, Mr. London's attorney argues that his client's fears of incrimination are reasonable. He notes the fact that the Government chose not to prosecute the gambling count of the second superseding indictment. He also argues that any testimony by Mr. London about his activities during 1983 through 1985 could be used as a predicate in a RICO prosecution for a later period. We cannot say that Mr. London's position is clearly mistaken. See Hoffman v. United States, supra at 486. Accordingly, we agree with petitioners that Mr. London was unavailable at trial due to his assertion of the Fifth Amendment privilege against self-incrimination. We also agree that Mr. London's deposition in the wrongful levy suit constitutes "former testimony" described by rule 804(b)(1) of the Federal Rules of Evidence. Therefore, Mr. London's deposition in the wrongful levy suit is hereby accepted into evidence.

Admissibility of the Tapes and Transcripts
From the Electronic Surveillance of Heller's Cafe

At trial, respondent sought to introduce into evidence the tape recordings and transcripts of conversations that were intercepted during the electronic surveillance of Heller's Cafe, described above. Petitioners object to the tape recordings and transcripts of the intercepted conversations and to certain other evidence that they claim was derived from the intercepted conversations, consisting of the testimony of various Government agents about the search conducted at Heller's Cafe on December 17, 1986. We refer to all of the evidence that is the subject of petitioners' objection as "the intercepted communications".

Petitioners' position is that 18 U.S.C. section 2515 (1970), a statutory suppression provision, enacted as part of the Federal wiretapping statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351, 82 Stat. 211-225, prohibits the reception of the intercepted communications into evidence in these proceedings. Title 18 U.S.C. section 2515 provides as follows:

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

According to petitioners, the disclosure of the intercepted communications in these proceedings is contrary to 18 U.S.C. section 2517(5) and, thus, it would be in "violation of this chapter" (i.e., 18 U.S.C. sections 2510-2522).

Title 18 U.S.C. section 2517(5) provides as follows:

When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

Petitioners contend that the intercepted communications relate "to offenses other than those specified in the order

of authorization or approval" within the meaning of 18 U.S.C. section 2517(5).  Petitioners argue that respondent, accordingly, was required to obtain authorization or approval by a court of competent jurisdiction before the contents of the intercepted communications could be disclosed or used in these cases.  18 U.S.C. sec. 2517(5). Respondent having failed to obtain such an order, petitioners argue that respondent's disclosure of the contents of the electronic surveillance in these cases would violate 18 U.S.C. section 2517(5), and, thus, such contents are not admissible in evidence in this proceeding pursuant to 18 U.S.C. section 2515.

Congress enacted 18 U.S.C. section 2517(5) and imposed the requirement of making a subsequent application to obtain judicial approval to disclose communications involving "offenses other than those specified in the order of authorization or approval", in order to provide assurance that the Government could not secure a wiretap authorization order to investigate an offense as a subterfuge to acquire evidence of a different offense for which the prerequisites to an authorization order were lacking.  See, e.g., United States v. McKinnon, 721 F.2d 19, 22 (1st Cir. 1983); United States v. Southard, 700 F.2d

1, 31 (1st Cir. 1983); United States v. Campagnuolo, 556 F.2d 1209, 1214 (5th Cir. 1977); United States v. Levine, 690 F. Supp. 1165, 1170 (E.D.N.Y. 1988).  Congress intended the subsequent application to "include a showing that the original order was lawfully obtained, that it was sought in good faith and not as subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order."  S. Rept. 1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2189.

We agree with respondent that 18 U.S.C. section 2515 of the Federal wiretap statute does not require suppression of the wiretap evidence in these cases.  First, we do not agree that disclosure of the intercepted communications in these cases would violate 18 U.S.C. section 2517(5). Obviously, if there is no violation of 18 U.S.C. section 2517(5), then there is no predicate for petitioners' argument that suppression of the wiretap evidence is required by 18 U.S.C. section 2515.  Title 18 U.S.C. section 2517(5) applies only to "communications relating to offenses other than those specified in the order of authorization or approval".  We interpret the term "offenses", as used in 18 U.S.C. section 2517(5), in

conformity with the use of the same term in 18 U.S.C. section 2516, to mean crimes or criminal conduct. However, respondent is not using the contents of the intercepted communications in this proceeding as proof of tax evasion or some other tax offense. To the contrary, respondent is using the intercepted communications in these civil tax cases to satisfy the Commissioner's burden of proof with respect to the fraud addition under section 6653(b)(1) and (2). This is a civil, not a criminal, penalty. Helvering v. Mitchell, 303 U.S. 391 (1938).

We acknowledge that it might also be possible to use the intercepted communications as evidence of one or more tax crimes but that is not the use to which they are being put here. We do not believe that 18 U.S.C. section 2517(5) is violated by disclosure of the intercepted communications in a civil proceeding by reason of the fact that the same communications could theoretically be used to prove offenses other than those originally specified. See United States v. Campagnuolo, supra at 1214-1215. It is difficult to perceive how 18 U.S.C. section 2517(5) would be violated in these cases, in view of the fact that the Government does not seek to use the intercepted communications as evidence of a tax offense. See United States v.

Campagnuolo, supra.  Contrary to petitioners' position,

the introduction of the intercepted communications in

these cases appears to be specifically approved by 18

U.S.C. section 2517(3), which states as follows:

> Any person who has received, by any means
> authorized by this chapter any information
> concerning a wire, oral, or electronic
> communication, or evidence derived therefrom
> intercepted in accordance with the provisions
> of this chapter may disclose the contents of
> that communication or such derivative evidence
> while giving testimony under oath or affirmation
> in any proceeding held under the authority of
> the United States or of any State or political
> subdivision thereof.

Second, even assuming, ad arguendo, that disclosure

of the intercepted communications in these cases, without

first obtaining judicial approval, would constitute a

violation of 18 U.S.C. section 2517(5), we do not agree

that suppression of the communications would be required

under 18 U.S.C. section 2515.  That provision is intended

to be read in light of 18 U.S.C. section 2518(10)(a), which

defines the class of persons entitled to make a motion to

suppress and enumerates the circumstances that trigger

suppression under section 2515.  S. Rept. 1097, supra,

reprinted in 1968 U.S.C.C.A.N. 2185.  Title 18 section

2518(10)(a) provides the following three grounds for a

motion to suppress:

> (i)  the communication was unlawfully
> intercepted;

> (ii)  the order of authorization or approval
> under which it was intercepted is insufficient
> on its face; or

> (iii) the interception was not made in conformity
> with the order of authorization or approval.

In reviewing the relationship of those provisions, 18

U.S.C. sections 2515 and 2518(10)(a), the Supreme Court

held in United States v. Giordano, 416 U.S. 505 (1974),

and United States v. Chavez, 416 U.S. 562 (1974), that

"(not) every failure to comply fully with any requirement

provided in Title III would render the interception of

wire or oral communications 'unlawful.'"  United States v.

Donovan, 429 U.S. 413, 433 (1977) (quoting United States v.

Chavez, supra at 574-575).  According to the Supreme Court:

> suppression is required only for a "failure to
> satisfy any of those statutory requirements
> that directly and substantially implement the
> congressional intention to limit the use of
> intercept procedures to those situations clearly
> calling for the employment of this extraordinary
> investigative device."

Id. at 433-434 (quoting United States v. Giordano, supra at

527).

Title 18 U.S.C. section 2517 deals with the use and disclosure of intercepted wire or oral communications in specified circumstances.  S. Rept. 1097, supra reprinted in 1968 U.S.C.C.A.N. 2188.  Therefore, a violation of 18 U.S.C. section 2517 would not seem to implicate the suppression remedy specified in 18 U.S.C. section 2518(10)(a) which applies to unlawful interceptions.  Based upon this reasoning, a number of courts have held that suppression under 18 U.S.C. section 2515 is not a remedy for violation of 18 U.S.C. section 2517.  E.g., United States v. Williams, 124 F.3d 411, 426-427 (3d Cir. 1997); United States v. Barnes, 47 F.3d 963, 965 (8th Cir. 1995); United States v. Davis, 780 F.2d 838, 845-846 (10th Cir. 1985); United States v. Cardall, 773 F.2d 1128, 1133-1134 (10th Cir. 1985); Resha v. United States, 767 F.2d 285, 287-288 (6th Cir. 1985); United States v. Horton, 601 F.2d 319, 324 (7th Cir. 1979); United States v. Vento, 533 F.2d 838, 855 (3d Cir. 1976); United States v. Iannelli, 477 F.2d 999, 1001 (3d Cir. 1973), affd. on other grounds 420 U.S. 770 (1975); United States v. Aloi, 449 F. Supp. 698, 717 (E.D.N.Y. 1977).  According to these courts, the remedy for an unauthorized disclosure is found in 18 U.S.C. section 2520 which provides a civil action for damages to

any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of Title III.

It is unnecessary in the instant cases for us to follow the above cases and to decide that, as a matter of law, the statutory suppression rule set forth in 18 U.S.C. section 2515 is never applicable as a sanction for violation of section 2517.  To decide these cases, it is only necessary to conclude, as we do, that the facts and circumstances are such that suppression is not an appropriate remedy.  The same approach was taken in Fleming v. United States, 547 F.2d 872 (5th Cir. 1977). See Spatafore v. United States, 752 F.2d 415, 417-418 (9th Cir. 1985); Griffin v. United States, 588 F.2d 521, 524-526 (5th Cir. 1979); Estate of Best v. Commissioner, 76 T.C. 122, 141-142 (1981).

In these cases, like Fleming v. United States, supra, the subject communications were lawfully intercepted during a duly authorized wiretap, and the court orders authorizing or approving the original interception and its extension were sought in good faith and not as subterfuge.  In fact, Mr. London's jury conviction of conspiring to conduct and actually conducting the affairs of an enterprise through a

pattern or racketeering activity, money laundering, failing to file CTR's, conspiring to commit extortion, and aiding and abetting extortion was affirmed by the Court of Appeals. United States v. London, 66 F.3d 1227 (1st Cir. 1995). Furthermore, in these cases, like Fleming v. United States, supra, the intercepted communications were made part of the public record of Mr. London's criminal prosecution, so that petitioners' privacy interest in the subject communication is extremely weak.

In passing, we note that on appeal Mr. London, seeking to overturn the District Court's denial of his motion to suppress evidence, argued that the electronic surveillance conducted at Heller's Cafe in 1986 violated the Federal wiretap law in five ways:

> (1) no Department of Justice official designated in 18 U.S.C. § 2516(1) had authorized the local United States Attorney to apply for the initial interception orders; (2) the orders improperly allowed the government to monitor conversations relating to money laundering, which was not an offense for which interception could be ordered, see 18 U.S.C. § 2516(1)(a)-(o), on the date the interception orders issued; (3) the government intercepted and disclosed extortion-related conversations--conversations pertaining to the paying of "rent" to Ferrara--beyond the scope of the court's orders; (4) the court ordered and the government employed inadequate minimization procedures under 18 U.S.C. § 2518(5); and (5) the government's application misled the district court as to the necessity for conducting

electronic surveillance, in violation of 18
U.S.C. §2518(1)(c).  * * *

The Court of Appeals rejected Mr. London's position and affirmed the District Court's denial of the suppression motion.  United States v. London, supra.

In Fleming v. United States, supra, the court rejected the taxpayer's argument that the contents of the intercepted communications should be suppressed under 18 U.S.C. section 2515 because the disclosure of the evidence to revenue agents was not authorized by 18 U.S.C. section 2517.  In view of ambiguities that the court found in 18 U.S.C. sections 2515 and 2517, the court interpreted the statute in light of its purposes and found that no purpose would be served by excluding lawfully seized evidence.  See Fleming v. United States, supra at 875.  The court set forth its holding as follows:

> We hold only that evidence derived from
> communications lawfully intercepted as part of
> a bona fide criminal investigation that results
> in the taxpayer's conviction may properly be
> admitted in a civil tax proceeding, at least
> when the evidence is already part of the public
> record of the prior criminal prosecution.  * * *

Similarly, we can see no purpose in suppressing, in this civil tax proceeding, the contents of the intercepted communications which were lawfully seized as part of a

bona fide criminal investigation that resulted in Mr. London's conviction and which previously were made part of the public record in that criminal prosecution. Spatafore v. United States, supra; Griffin v. United States, supra; Fleming v. United States, supra; Estate of Best v. Commissioner, supra.

The case on which petitioners rely, United States v. Brodson, 528 F.2d 214 (7th Cir. 1975), is distinguishable. In that case, the Government sought and received authorization to intercept telephone conversations for the purpose of investigating a violation of 18 U.S.C. section 1955, which prohibits the operation of an illegal gambling business in interstate commerce. Nevertheless, the Government presented the intercepted conversations to a grand jury and obtained the defendant's indictment under 18 U.S.C. section 1084, which prohibits the transmission of wagers and wagering information in interstate commerce. United States v. Brodson, supra at 215. The Government failed to seek an order under 18 U.S.C. section 2517(5) until approximately 8 months later, just prior to trial. United States v. Brodson, supra. Unlike the instant cases, United States v. Brodson, supra, involved an attempted use by the Government of the fruits of a wiretap to prove a

crime other than that specified in the order of authorization or approval. Accordingly, the Court of Appeals approved the District Court's dismissal of the indictment as a sanction for the Government's failure to obtain the order required by 18 U.S.C. section 2517(5).

Net Worth Computation

Taxpayers are required to keep adequate books or records from which their correct tax liability can be determined. Sec. 6001. In the absence of such books or records, the Commissioner is entitled to reconstruct a taxpayer's income by any reasonable means. Sec. 446(b). The net worth method is an indirect method of reconstruct-ing taxable income that has long been approved by the courts. See, e.g., Holland v. United States, 348 U.S. 121, 131 (1954); Manzoli v. Commissioner, 904 F.2d 101 (1st Cir. 1990), affg. T.C. Memo. 1989-94 and T.C. Memo. 1988-299; United States v. Sorrentino, 726 F.2d 876 (1st Cir. 1984); Mazzoni v. Commissioner, 451 F.2d 197 (3d Cir. 1971), affg. T.C. Memo. 1970-144 and T.C. Memo. 1970-37; McGarry v. United States, 388 F.2d 862 (1st Cir. 1967).

Under the net worth method, the Commissioner seeks to compute taxable income in a given year by determining from all available evidence of assets and liabilities the

increase (or decrease) in the taxpayer's net worth over a 12-month period, adding to it his nondeductible expenses for that year, and subtracting from that sum any amount attributable to nontaxable sources. McGarry v. United States, supra at 864. A net worth increase computed for a given year creates an inference of taxable income, if the Commissioner shows a likely source of unreported income or negates possible nontaxable sources. E.g., United States v. Massei, 355 U.S. 595 (1958); Manzoli v. Commissioner, supra at 104. The Commissioner must clearly and accurately establish the opening net worth of the taxpayer by competent evidence. See Manzoli v. Commissioner, supra at 104; United States v. Smith, 890 F.2d 711, 713 (5th Cir. 1989); Thomas v. Commissioner, 232 F.2d 520, 524 (1st Cir. 1956), revg. and remanding T.C. Memo. 1955-46.

In the instant cases, petitioners did not provide any books or records from which their tax liability could be computed, and respondent chose to reconstruct petitioners' income using the net worth method. As the starting point for the net worth computations, respondent used $251,597, the net worth reported on the financial statement that they submitted on August 16, 1976, to the Broadway National Bank in connection with their loan application to purchase the

property located at 79 Black Oak Road. Respondent then computed petitioners' net worth for the years 1976 through and including 1985. According to respondent's computation, petitioners' net worth increased from $251,597 to $1,908,738.01 during that time. The likely source of the increases in petitioners' net worth is the profits from Mr. London's unlawful activities. Respondent's net worth statement is summarized in Appendix A hereto.

Petitioners attack the net worth statement on three grounds. First, petitioners assert that respondent did not take into account the balances in five bank accounts. Second, petitioners contend that respondent used incorrect balances with respect to three bank accounts. Finally, petitioners argue that respondent failed to take into account a cash hoard derived by petitioners as gifts given from Mr. London's mother, Mrs. Ida London. We describe each of petitioners' factual contentions in detail below.

Even if we assume that respondent's net worth statement should be adjusted in order to take into account all of petitioners' contentions, that would cause no change in the taxable income determined by respondent for the year 1983 and 1985. This is shown in Appendix B hereto, in which all of the changes suggested by petitioners have been

made and there is no change in respondent's computation of taxable income for 1983 and 1985.

### Omitted Bank Balances

Petitioners assert that respondent's net worth statement is wrong because it does not take into account the balances that petitioners maintained at five banks with respect to which they reported interest income on their Federal income tax returns for 1976 through 1981. The five banks are Atlantic Savings, Commonwealth Bank, Marblehead Savings, Metropolitan Credit Union, and National Grand Bank. Petitioners assert that "the median rate of interest paid by banks in the years of the net worth investigation was 5%" and that "a reasonable way to ascertain a balance in a given account is to multiply the interest figure by 20% (sic)." Based upon this approach, it appears that petitioners are complaining that respondent omitted the following account balances from the net worth statement in these cases:

| | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|---|---|---|---|---|
| Atlantic Sav. | $17,940 | $6,260 | $3,100 | $13,660 | $600 | $320 | -- | -- | -- | -- |
| Metro. Credit Union | -- | 1,420 | 13,220 | -- | -- | -- | -- | -- | -- | -- |
| Metro. Credit Union | -- | 1,420 | -- | -- | -- | -- | -- | -- | -- | -- |
| Metro. Credit Union | -- | 1,420 | -- | -- | -- | -- | -- | -- | -- | -- |
| Commonwealth Bank | 1,200 | 3,020 | 10,380 | -- | 12,460 | -- | -- | -- | -- | -- |
| Commonwealth Bank | 2,820 | 3,020 | -- | -- | -- | -- | -- | -- | -- | -- |
| Commonwealth Bank | 3,180 | 3,480 | -- | -- | -- | -- | -- | -- | -- | -- |
| Commonwealth Bank | 2,820 | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Natl. Grand Bank | 9,040 | 4,500 | -- | -- | -- | -- | -- | -- | -- | -- |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Natl. Grand Bank | 9,580 | 5,100 | -- | -- | -- | -- | -- | -- | -- | -- |
| Natl. Grand Bank | 9,640 | 4,220 | -- | -- | -- | -- | -- | -- | -- | -- |
| Marblehead Sav. | 11,800 | -- | 60 | -- | -- | -- | -- | -- | -- | -- |
| | 68,020 | 33,860 | 26,760 | 13,660 | 13,060 | 320 | -- | -- | -- | -- |

If we were to accept petitioners' assertion that they maintained balances in the accounts at the five banks in the amounts and for the years shown above, we would agree with their contention that respondent's net worth statement should have included those bank balances as assets.  It is unnecessary to make that finding, however, because even if it were true, it would not change respondent's computation of petitioners' taxable income for 1983 and 1985.  The revised net worth statement attached hereto as Appendix B shows that inclusion of the above bank balances as assets would not cause any change in respondent's computation of taxable income for 1983 and 1985.

Incorrect Bank Balances

Petitioners also complain that the balances included in respondent's net worth statement for accounts at three banks are wrong.  First, petitioners complain that respondent's net worth statement includes a balance of $18,288.31 for petitioners' Shawmut County Bank account No. 685-94601, for the first time in 1984, whereas, in fact,

the account was opened in 1977 with an initial deposit of $10,009.24. In effect, it appears that petitioners are complaining that their total assets are understated by $10,009.24 from 1977 when the account was opened through 1983, the year before respondent included the account in the net worth computation.

Second, petitioners complain that the Provident Institution for Savings account which is included on respondent's net worth statement beginning in 1979, "had been opened in or prior to 1969 and had substantial balances prior to 1976." Respondent included this account on the net worth statement for the first time in 1979 with a balance of $8,168.06. Petitioners contend that they maintained balances in the account prior to that year. Essentially, petitioners complain that respondent's net worth statement understates their total assets by the amount that was in the Provident Institution for Savings account from 1976 through 1978, the year before respondent included the account in his net worth computation.

Third, petitioners complained at trial that respondent's net worth statement fails to include yearend balances that were on deposit in the Carmel Credit Union, account No. 17795, from 1976 through 1979. Respondent

first included the Carmel Credit Union account in 1980 with a balance of $280.11. Petitioners contend that their total assets are understated by the amounts that were in the Carmel Credit Union account from 1976 through and including 1979. A check register from that account shows a balance in the account of $648 at the end of 1977, $727.25 at the end of 1978, and $25,105 at the end of 1979.

In the revised net worth statement attached hereto as Appendix B, we have adjusted respondent's net worth statement by including a balance of $10,009.24 in the Shawmut County Bank account for the years 1977 through 1983; by including a balance of $8,168.06 in the Provident Institute for Savings account for 1976 through 1978; and by including the yearend balances shown by the check register for the Carmel Credit Union account No. 17795 for 1977 through 1979. Appendix B demonstrates that, even if we accept petitioners' position that respondent's net worth statement is in error with respect to those balances, the errors have no effect on respondent's computation of petitioners' net worth or taxable income for 1983 and 1985.

Cash Hoard Obtained as Gifts From Mr. London's Mother

Finally, petitioners argue that respondent's net worth statement is wrong because it fails to take into account a

cash hoard obtained as gifts from petitioner's mother, Mrs. Ida London. According to petitioners, Mrs. Ida London gave them cash from Treasury bonds and other securities, worth from $149,000 to $200,000, the proceeds from the sale in 1980 of Mrs. Ida London's property at 400 and 402 Broadway in the amount of $27,000, the proceeds from the sale in 1981 of Mrs. Ida London's home at Franklin Avenue in the amount of $28,000, Treasury bills and certificates of deposit in an amount from $100,000 to $200,000, and occasional cash gifts. Petitioners argue that respondent's "disregard of a possible cash hoard (bond proceeds and other property of Ida London) and disregard for the existence of a plausible explanation as to the informal transfer of parental property to their only child, only daughter-in-law, and grandchildren, indicates that the net worth statement is wrong and cannot retain its presumption of correctness in this case."

At the outset, we note that the record as to each of the assets that petitioner's mother allegedly gave to petitioners is vague as to the amount of the asset and the time that she allegedly transferred it to her son and his family. For example, Mrs. London testified that her mother-in-law had "close to $200,000" in bonds whereas a

list of the bonds that petitioner sought to introduce into evidence, totaled $162,050, according to respondent's agent, of which $12,450 had not been redeemed at the time of trial. On the other hand, petitioner proposed the following finding of fact which states that bonds totaling $180,500 were cashed prior to April 1980:

> 141. Agent Sullivan testified bonds were cashed prior to April, 1980 (Tr. 566) in the following amounts and years:
>
> | 1971 | $ 500 |
> |------|-------|
> | 1974 | 82,000 [82,700] |
> | 1975 | 36,600 |
> | 1976 | 5,500 |
> | 1979 | 500 |
> | 1980 | 54,700 |

There are also outstanding evidentiary issues, such as whether the list of bonds, referred to above, can be accepted into evidence as the past recollection recorded of Mrs. London under rule 803(5) of the Federal Rules of Evidence. In passing, we note that we found Mrs. London's testimony, regarding the gifts that her family received from her husband's mother, to have been vague, self-serving, and not credible. Of course, we are not obligated to accept such testimony. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Moreover, we are skeptical of petitioners' argument that Mrs. Ida London was able to accumulate such large sums of cash by her frugal lifestyle. First, the only source of Mrs. Ida London's income was London's Cafe, Inc., which did not report any taxable income in the 10 years from 1976 through 1985. Furthermore, the tax paid by petitioner's parents during the last 15 years of Mr. Isadore London's life shows that the couple earned very little income and Mrs. Ida London filed no tax return during the last 7 years of her life. Petitioner's parents did not file gift or estate tax returns during 1966 through 1994, and they left no probate estate. Furthermore, on February 11, 1981, when Mrs. Ida London sold her home on Franklin Avenue, she rented an apartment located in a subsidized housing project.

It is unnecessary to resolve the factual and evidentiary issues presented by petitioners' cash hoard defense because even accepting petitioners' assertion that Mrs. Ida London transferred her property to them, we would still hold for respondent. This is true because even if we were to accept petitioners' position that Mrs. Ida London transferred the subject assets to them, there is nothing in the record to establish that the net worth increases

computed by respondent for 1983 and 1985 are in any way linked to any of those assets. For example, in the case of the bonds, the principal source of alleged gifts, petitioners ask the Court to find, based upon Agent Sullivan's testimony, that the bonds were cashed prior to April 1980. However, there is no testimony or other evidence concerning the manner in which this alleged sum was expended or indicating it has any relationship to the net worth increases in 1983 and 1985. See McGarry v. United States, 388 F.2d 862, 866-867 (1st Cir. 1967). The same is true of the proceeds from the sale of Mrs. Ida London's property at 400 and 402 Broadway for $27,000 in 1980, and the proceeds from the sale of her home at Franklin Avenue in the amount of $28,000 in 1981. In the case of the funds that were invested in Treasury bills or certificates of deposit through Mrs. Ida London's account at Broadway National Bank, petitioners' proof suggests that approximately $100,000 to $200,000 were invested through the account beginning in 1975, but there is no evidence to suggest that such funds were withdrawn from the account prior to or during 1983 or 1985. For the above reasons, we sustain respondent's determination of petitioners' taxable income for 1983 and 1985.

Whether Petitioners Filed a Joint Return for 1985

We disagree with petitioners' contention that they did not file a joint return for 1985, and, therefore, Mrs. London "cannot be held liable for any deficiency thereon." Petitioners' position is based solely upon the contention that she did not sign the 1985 return. However, it is clear that there can be a binding joint return even though one of the spouses fails to sign the return. E.g., O'Connor v. Commissioner, 412 F.2d 304, 309 (2d Cir. 1969), affg. in part, revg. in part and remanding T.C. Memo. 1967-174; Heim v. Commissioner, 251 F.2d 44, 45 (8th Cir. 1958), affg. 27 T.C. 2700 (1956); Kann v. Commissioner, 210 F.2d 247, 251-252 (3d Cir. 1953), affg. per curiam 18 T.C. 1032 (1952). In this case, there is ample evidence from which we infer that Mrs. London intended to file a joint return with her husband. For example, Mrs. London had a long history of filing joint tax returns. The 1985 return included her wage income and income from other sources such as jointly held property. Her petition in this Court does not assert that she did not file a joint return. Most significantly, at trial, she testified only that she did not sign the 1985 return. She did not testify that she had

no intention to file a joint return or that Mr. London signed the 1985 return without her consent.

### Additions to Tax for Fraud

Respondent determined that petitioners are liable for the additions to tax for fraud under section 6653(b)(1) and (2) with respect to their 1983 and 1985 returns. Section 6653(b)(1) imposed an addition to tax in the amount of 50 percent of the underpayment if any part of the underpayment is due to fraud, and section 6653(b)(2) imposed an addition to tax in the amount of 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment which is attributable to fraud. For purposes of section 6653, "fraud" is defined as an actual, intentional wrongdoing, or intentionally committing an act specifically to evade a tax believed to be owing. Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939).

Respondent bears the burden of proving by clear and convincing evidence: (1) That there is an underpayment of tax, and (2) that some part of this underpayment is due to fraud. Sec. 7454(a); Rule 142(b). Fraud is established by showing that the taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or

otherwise prevent the collection of such tax.  Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  In the case of a joint return, respondent must prove some part of the underpayment is due to the fraud of each spouse.  Sec. 6653(b)(4); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Stone v. Commissioner, 56 T.C. 213, 227-228 (1971).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud will never be imputed or presumed but must be established by clear and convincing evidence.  Beaver v. Commissioner, 55 T.C. 85, 92 (1970).  Since direct proof of a taxpayer's fraudulent intent is rarely available, fraud may be shown by circumstantial evidence.  Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. per curiam 748 F.2d 331 (6th Cir. 1984).  A taxpayer's entire course of conduct may establish the requisite fraudulent intent.  Stone v. Commissioner,

supra at 223-224; Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).

Courts have developed several indicia or "badges of fraud." These "badges of fraud" include: (1) Understating income; (2) maintaining inadequate records; (3) failing to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing income or assets; (6) failing to cooperate with tax authorities; (7) engaging in illegal activities; (8) an intent to mislead which may be inferred from a pattern of conduct; (9) lack of credibility of the taxpayer's testimony; (10) filing false documents; and (11) dealing in cash. Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, supra at 910. Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors may be persuasive evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603. A taxpayer's intelligence and education are also relevant for purposes of determining fraudulent intent. Stephenson v. Commissioner, supra at 1006.

Mr. London concedes that his guilty plea to tax evasion in violation of section 7201 for 1985 estops him from denying liability for additions to tax for fraud under section 6653(b)(1) and (b)(2) for that year. The issues remaining for decision are whether Mr. London is liable for the additions to tax for fraud for petitioners' 1983 return and whether Mrs. London is liable for the additions to tax for fraud for 1983 and 1985.

Respondent contends that the following facts, when taken as a whole, establish that petitioners' underpayment of tax for 1983 and 1985 was attributable to fraud: (1) There is a large discrepancy between petitioners' actual income and the income reported on their returns for 1983 and 1985; (2) petitioners did not keep adequate books or records from which their tax liability could be computed; (3) Mr. London was engaged in illegal activities; (4) Mr. London attempted to conceal his illegal activities; (5) Mrs. London was actively involved in petitioners' finances; (6) Mr. London did not supply complete information about the check-cashing business' income and expenses to Mr. Trugman, the accountant who prepared the Schedule C for M.L. Associates; and (7) Mrs. London's

explanations of her behavior are implausible or inconsistent.

We agree with respondent that several indicia of fraud are present with respect to Mr. London. In these cases, Mr. London failed to report income in the amounts of $311,974.34 for 1983 and $213,120.25 for 1985. These understatements represented approximately a 20-percent omission of income for 1983 and a 45-percent omission for 1985. Substantial understatements of income in successive years, when coupled with other circumstances showing an intent to conceal or misstate income, justify an inference of fraud. Holland v. United States, 348 U.S. at 137-139; Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148. Moreover, the fact that Mr. London engaged in illegal activities, and was con- victed of RICO offenses, money laundering, extortion, and failure to file CTR's, is a badge of fraud. Bradford v. Commissioner, supra at 307-308. Mr. London has not shown that he maintained adequate books and records for M.L. Associates, his check-cashing business. Special Agent Rooks testified that he found no formal books and records for M.L. Associates. Mr. London's failure to maintain adequate records is indicative of fraud. Truesdell v.

Commissioner, 89 T.C. 1280, 1302 (1987).  In addition, Mr. London supplied inaccurate information to Mr. Trugman, an accountant who prepared the Schedules C for M.L. Associates.  Mr. Trugman testified that he was not able to track all the deposits made into accounts for M.L. Associates.  Providing incorrect information to a tax return preparer is also a badge of fraud.  Estate of Temple v. Commissioner, 67 T.C. 143, 162-163 (1976).

Upon consideration of the entire record, we find that respondent has proven by clear and convincing evidence that Mr. London acted with the requisite fraudulent intent, and that the entire understatement of tax for 1983 and 1985 is due to Mr. London's fraud, as determined by respondent. Accordingly, we sustain respondent's determination that Mr. London is liable for the additions to tax for fraud under section 6653(b)(1) and (2).

We reach a different conclusion with respect to Mrs. London.  In her case, we do not believe that respondent has proven by clear and convincing evidence that she intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax.  See Recklitis v. Commissioner, 91 T.C. at 909; Rowlee v. Commissioner, 80 T.C. at 1123.

Respondent's proof of Mrs. London's fraud is principally based on the contention that she "was deeply involved in the couple's business and financial affairs."  We agree that Mrs. London owned stock in London Cafe, Inc., wrote checks on various accounts maintained by petitioners, and purchased assets such as real estate and automobiles. However, there is no evidence of her involvement in Mr. London's illegal activities, the source of the unreported income.  For example, during the surveillance of Heller's Cafe, Mrs. London was never observed in the bar.  She was not a target of the Government's investigation.  As to the unreported income, Mr. London insulated his wife from the reporting of that income by supplying information for preparation of the Schedules C, Profit or (Loss) From Business or Profession, to Mr. Trugman.  The Schedules C were then given to Mr. Silverstein for preparation of petitioners' joint individual income tax returns.  There is no evidence that Mrs. London was involved in the accounting for or reporting of, income from Mr. London's illegal activities.  Upon consideration of the entire record, we find no clear and convincing evidence that Mrs. London took any action

intended to conceal, mislead, or otherwise prevent the collection of Federal income tax.

## Additions to Tax Under Section 6661

Respondent determined that petitioners are liable for the addition to tax for substantial understatement of liability under section 6661. Section 6661 imposes an addition to tax of 25 percent of any underpayment attributable to a substantial understatement of income tax which is assessed after October 21, 1986. Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). A substantial understatement is any understatement which exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6661(b)(1). Petitioners bear the burden of proving that respondent's determinations are incorrect. Rule 142(a).

Petitioners failed to address this issue at trial or in their posttrial briefs. They have shown no reason why they are not liable for the addition to tax. Accordingly, we sustain respondent's determination that petitioners are liable for the addition to tax for substantial understatement of liability under section 6661.

## Innocent Spouse Relief

Petitioners claim that Mrs. London is eligible to be relieved of liability for the tax deficiencies and

additions to tax for 1983 and 1985 under former section 6013(e). Following passage of section 6015 by the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3201(a), 112 Stat. 685, 734, the Court is deferring consideration of this issue until the parties have been given an opportunity to provide the Court with their positions concerning the effect of the new law.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.

## Appendix A

| Net worth statement | 08/16/76 | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total assets | $254,597.00 | $417,800.55 | $343,773.61 | $408,147.79 | $605,402.54 | $912,161.46 | $1,030,570.49 | $1,437,979.16 | $1,793,399.62 | $2,120,610.58 | $2,253,066.90 |
| Liabilities | 3,000.00 | 82,739.84 | 78,788.41 | 82,091.30 | 83,995.57 | 86,277.71 | 88,446.53 | 261,061.04 | 265,995.99 | 460,999.21 | 284,328.83 |
| Net worth | 251,597.00 | 335,060.71 | 264,985.20 | 326,056.49 | 521,406.97 | 825,883.75 | 942,123.96 | 1,176,918.12 | 1,527,403.63 | 1,659,611.37 | 1,968,738.07 |
| Less: prior year's net worth | | 251,597.00 | 335,060.71 | 264,985.20 | 326,056.49 | 521,406.97 | 825,883.75 | 942,123.96 | 1,176,918.12 | 1,527,403.63 | 1,659,611.37 |
| Increase (decrease) in net worth | | 83,463.71 | (70,075.51) | 61,071.29 | 195,350.48 | 304,476.78 | 116,240.21 | 234,794.16 | 350,485.51 | 132,207.74 | 309,126.70 |
| Plus: | | | | | | | | | | | |
| Nondeductible expenditures | | | | | | 35,633.45 | 45,796.50 | 54,560.89 | 84,634.61 | 115,836.98 | 129,495.55 |
| Nondeductible capital loss | | | | | | 6,980.55 | 4,188.00 | -0- | 1,476.00 | -0- | 3,000.00 |
| Subtotal | | | | | | 347,090.78 | 166,224.71 | 289,355.05 | 436,596.12 | 24,8044.72 | 441,622.25 |
| Less: | | | | | | | | | | | |
| Non-Taxable items | | | | | | 7,635.02 | 2,300.51 | 16,773.00 | 19,995.78 | 78,902.17 | 65,215.00 |
| Corrected AGI | | | | | | 339,455.76 | 163,924.20 | 272,582.05 | 416,600.34 | 169,142.55 | 376,407.25 |
| Excess itemized deductions | | | | | | 12,684.00 | 15,438.72 | 12,138.00 | 33,625.00 | 59,169.00 | 60,165.00 |
| Personal exemptions | | | | | | | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,240.00 |
| Corrected taxable income | | | | | | 326,771.76 | 142,485.48 | 254,444.05 | 376,975.34 | 103,973.55 | 310,002.25 |
| Taxable income per return | | | | | | 54,427.00 | 69,571.00 | 74,868.00 | 65,001.00 | 112,665.00 | 96,882.00 |
| Unreported income | | | | | | 272,344.76 | 72,914.48 | 179,576.05 | 311,974.34 | (8,691.45) | 213,120.25 |

# Appendix B

| Revised net worth statement | Pre-1976 | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlantic Sav. | | $17,940.00 | $6,260.00 | $3,100.00 | 13,660.00 | $600.00 | $320.00 | | | | |
| Commonwealth Bank | | 1,200.00 | 3,020.00 | 10,380.00 | | 12,460.00 | | | | | |
| Commonwealth Bank | | 2,820.00 | 3,020.00 | | | | | | | | |
| Commonwealth Bank | | 3,180.00 | 3,480.00 | | | | | | | | |
| Commonwealth Bank | | 2,820.00 | | | | | | | | | |
| Marblehead Sav. | | 11,800.00 | | 60.00 | | | | | | | |
| Metro, Credit Union | | | 1,420.00 | 13,220.00 | | | | | | | |
| Metro. Credit Union | | | 1,420.00 | | | | | | | | |
| Metro. Credit Union | | | 1,420.00 | | | | | | | | |
| Grand Natl. Bank | | 9,040.00 | 4,500.00 | | | | | | | | |
| Grand Natl. Bank | | 9,580.00 | 5,100.00 | | | | | | | | |
| Grand Natl. Bank | | 9,640.00 | 4,220.00 | | | | | | | | |
| Shawmut Bk. of Boston | | | 10,009.24 | 10,009.24 | 10,009.24 | 10,009.24 | 10,009.24 | 10,009.24 | 10,009.24 | | |
| Provident | $8,168.06 | 8,168.06 | 8,168.06 | 8,168.06 | | | | | | | |
| Carmel | | 648.00 | 648.00 | 727.25 | 25,105.09 | | | | | | |
| Adjustments | 8,168.06 | 76,836.06 | 52,685.30 | 45,664.55 | 48,774.33 | 23,069.24 | 10,329.24 | 10,009.24 | 10,009.24 | -0- | -0- |
| Total assets per net worth statement | 254,597.00 | 417,800.55 | 343,773.61 | 408,147.79 | 605,402.54 | 912,161.46 | 1,030,570.49 | 1,437,979.16 | 1,793,399.62 | $2,120,610.58 | $2,253,066.90 |
| Adjusted total assets | 262,765.06 | 494,636.61 | 396,458.91 | 453,812.34 | 654,176.87 | 935,230.70 | 1,040,899.73 | 1,447,988.40 | 1,803,408.86 | 2,120,610.58 | 2,253,066.90 |
| Liabilities | 3,000.00 | 82,739.84 | 78,788.41 | 82,091.30 | 83,995.57 | 86,277.71 | 88,446.53 | 261,061.04 | 265,995.99 | 460,999.21 | 284,328.83 |
| Net worth | 259,765.06 | 411,896.77 | 317,670.50 | 371,721.04 | 570,181.30 | 848,952.99 | 952,453.20 | 1,186,927.36 | 1,537,412.87 | 1,659,611.37 | 1,968,738.07 |
| Less: prior year's net worth | | 259,765.06 | 411,896.77 | 317,670.50 | 371,721.04 | 570,181.30 | 848,952.99 | 952,453.20 | 1,186,927.36 | 1,537,412.87 | 1,659,611.37 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Increase (decrease) in net worth | 152,131.71 | (94,226.27) | 54,050.54 | 198,460.26 | 278,771.69 | 103,500.21 | 234,474.16 | 350,485.51 | 122,198.50 | 309,126.70 |
| Nondeductible expenditures | | | | | 35,633.45 | 45,796.50 | 54,560.89 | 84,634.61 | 115,836.98 | 129,495.55 |
| Nondeductible capital loss | | | | | 6.980.55 | 4,188.00 | - 0 - | 1,476.00 | - 0 - | 3,000.00 |
| Subtotal | | | | | 321,385.69 | 153,484.71 | 289,035.05 | 436,596.12 | 238,035.48 | 441,622.25 |
| Non-Taxable items | | | | | | | | | | |
| Bonds | 124,600.00 | | | 500.00 | 54,700.00 | | | | | |
| Treasury bills | | | 200,000.00 | | | | | | | |
| Proceeds from sale of home at Franklin Ave. | | | | | | 28,000.00 | | | | |
| Proceeds from sale of 400 & 402 Broadway | | | | | 27,000.00 | | | | | |
| Other Non-Taxable items | | | | | 7,635.02 | 2,300.51 | 16,773.00 | 19,995.78 | 78,902.17 | 65,125.00 |
| Corrected AGI | | | | | 232,050.67 | 123,184.20 | 272,262.05 | 416,600.34 | 159,133.31 | 376,407.25 |
| Excess itemized deductions | | | | | 12,684.00 | 15,438.72 | 12,138.00 | 33,625.00 | 59,169.00 | 60,165.00 |
| Personal exemptions | | | | | | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,240.00 |
| Corrected taxable income | | | | | 219,366.67 | 101,745.48 | 254,124.05 | 376,975.34 | 93,964.31 | 310,002.25 |
| Taxable income per return | | | | | 54,427.00 | 69,571.00 | 74,868.00 | 65,001.00 | 112,665.00 | 96,882.00 |
| Unreported income | | | | | 164,939.67 | 32,174.48 | 179,256.05 | 311,974.34 | (18,700.69) | 213,120.25 |